HARKINS, Commissioner:
Concurring in the result.
I concur in the payments recommended by the review panel. Two parts of the opinion, however, require a change in emphasis and more precise delineation. The degree to which the Marines share responsibility for claimants’ injuries needs to be clarified. Whether the Government’s obligation to claimants is based on a legal or equitable claim or is in the nature of a gratuity needs to be more fully defined.
In my view, initiation of the firing that resulted in claimants’ injuries arose in a factual complex in which neither the Marines nor the claimants are free from blame. Claimants properly can be held to have assumed the risk of such an incident as occurred, and by their own negligence to have contributed to the cause of their own injuries. While I concur that it cannot be said responsibly as a matter of law that the Marines acted unreasonably in opening fire, the facts in this case are clear that the start of firing by the Marine guard involved a collapse of discipline and a loss of command control that was not warranted by the circumstances.
It is true that we have the benefits of hindsight and, as Mr. Justice Holmes stated, “detached reflection cannot be demanded in the presence of an uplifted knife.” [31] By the nature of things, however, judgment in a case such as this must be made after the event in the light of reconstituted facts and the results that followed. Although the Marine guards’ actions may not meet the tests of actionable negligence as required in a court, claimants’ injuries would not have resulted had the chain of command maintained control. No order was given to open fire at checkpoint “Alpha.”[32] Loss of command control over combat troops in these circumstances, in addition to the other factors cited by the review panel, such as Govern *918 ment encouragement and support for independent news coverage, warrants concern by the Congress for these claims.
I do not believe that the review panel’s responsibility to define the Government’s obligation to the claimants is determined by the addition as a floor amendment of the phrase “good conscience” to H. Res. 1110. The review panel’s Obligation in a congressional reference case is founded on statutory law.[33] The addition of supplementary language by one body of Congress at the time the reference resolution is under consideration does not have the force and effect of an amendment to the basic law. It can neither add to nor subtract from the requirements of the reference statute.
The reference statute creates a procedure through which Congress is to be informed “whether the demand is a legal or equitable claim or a gratuity.” The reference statute only specifically directs, however, that information as to amount of compensation, if any, is to be furnished if legally or equitably due from the United 'States. No information is requested with respect to the amount of any gratuity.
For many years Congress has recognized obligations to citizens that have arisen from circumstances which were beyond the powers delegated to either the Executive or Judicial Branch to recognize or compensate. These obligations were such that, were private parties only involved, no claim could be allowed. These Obligations, within the power of the Legislative Branch to satisfy, variously have been described as being 'based upon “broad moral principles of right and justice,” “upon the conscience of the sovereign,” or “upon considerations of a moral or merely honorary nature.”
Although the reference statute requires information that permits classification of the request as a legal or equitable claim, or a gratuity, Obligations in this class contain features that are at once both equitable in nature and in the nature of a gift, grant, bonus, or gratuity. The equitable features, however, do not satisfy the requirements for exercise of the traditional equitable powers of a court to enjoin action that threatens irreparable harm, to order reformation or rescission of contracts, or to enforce trusts in order to accomplish the requirements of justice.
*919 Classification of this type of obligation as an “equitable claim” or as a “gratuity” has varied. During the period When the Court of Claims responded to congressional references, in some cases, any claim that did not meet the judicial tests of a legal claim or an equitable claim, as those principles are applied in court, was treated as an application for a “gratuity.”[34] Other cases, however, have defined “equitable claim,” as used in the congressional reference statute, to include more than the strict technical meanings that are involved in a consideration of the principles of right and justice as administered by the courts. In these cases the term “equitable claim” also includes equity and justice in its broad moral sense.[35]
From the standpoint of the exercise of judicial power, an “equitable claim” is limited to court recognized concepts that determine rights and obligations and authorize the expenditures of public money. Congress has no such limitation on its power to recognize obligations that may be compensated from the public treasury. The Supreme Court has established that the power of Congress “to pay the debts” of the United States under the Constitution encompasses the power to recognize debts or claims which “rest upon a merely equitable or *920 honorary obligation, and which would not be recoverable in a court of law if existing against an individual.”[36] In this context, a claim that is not judicially enforceable but which involves a moral obligation in good conscience, from the standpoint of Congress, would involve an “equitaJble claim” and not a gratuity, bonus, gift, or bounty. Any limitation on this power of Congress to recognize moral obligations, if there be any limitation, would be found only in such circumstances where payment to the claimant would be arbitrary and without any public purpose whatsoever.
In the light of the foregoing, from the standpoint of exercise of congressional power, I view the requests here presented as equitable claims and not gratuities.
APPENDIX A
Opinion of the Trial Commissioner*
Spector, Commissioner:
The narrative facts which underlie this Congressional Reference case are hereinafter set forth in detail and (hopefully) readable form, numbered for ready reference. Their examination is essential as a prelude to an evaluation of the conclusions, and opinion which follows them.
Findings op Fact
THE CONGRESSIONAL PROCEEDINGS AND REFERENCE
1. This case has been referred to the Chief Commissioner of the Court of Claims and, in turn, by him to this Trial Commissioner, pursuant to Sections 1492 and 2509, Title 28, United States Code, which provide in pertinent part for findings of fact and conclusions “sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant [s].”
2. Specifically, the House of Representatives, on May 21, 1968, adopted H. Res. 1110 following a favorable report of its Committee on the Judiciary (Report No. 1237, 90th Cong., *921 2d Sess.). H. Res. 1110, in turn, refers a bill (H.R. 9752, 90th. Cong., 1st Sess.) entitled “A bill for the relief of Douglas E. Kennedy and Alvin V. Burt, Junior” for consideration of “negligence or other fault of the U.S. and/or equity and good conscience and any other matter within the court’s jurisdiction.” The referred bill (H.R. 9752), provides in pertinent part as follows:
* * * That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Douglas E. Kennedy, chief photographer of the Miami Herald, the sum of $75,000, and to AJvin V. Burt, Junior, former Latin American editor of the Miami Herald, the sum of $50,000. The payment of such sums shall be in full satisfaction of all claims of the said Douglas E. Kennedy and Alvin V. Burt, Junior, against the United States for personal injuries suffered by them on May 6, 1965, resulting in permanent injuries and constant pain, the said Douglas E. Kennedy and Alvin V. Burt, Junior, having been wounded by machineguns fired from an American checkpoint in Santo Domingo, Dominican Republic, by United States marines, while the said Douglas E. Kennedy and Alvin V. Burt, Junior, were returning to the American zone of Santo Domingo from an authorized press trip and after fully complying with the apparent directions of the United States marine sentry: * * *
3. The stenographic transcript and exhibits before Subcommittee No. 2 of the Committee on the Judiciary have been filed in the court and are deemed part of the record, along with the judicial proceedings hereinafter summarized.
PRETRIAL AND TRIAL PROCEEDINGS
4. As required by the Rules, a petition on behalf of the above-named persons was filed herein August 22,1968, alleging that petitioners “suffered severe bodily injuries and damage at the hands of the United States Government * * * through its servants, the United States Marines,” and that their injuries are “serious, permanent, and partially disabling in their severity. Petitioners have suffered, and will continue to suffer, great pain and anguish, and financial expense, loss of earnings, and loss of earning capacity.” Petitioner Douglas E. Kennedy “prays for an award of not less than *922 Seventy-five Thousand Dollars,” and Petitioner Alvin V. Burt, Jr., “prays for an award of not less than Fifty Thousand Dollars” plus interest, costs and fees “which in good conscience the United States Government should 'bear.”
5. Pretrial conferences between counsel and with the trial commissioner were held to simplify proof at the trial. Memorandum of pretrial conference September 8, 1969, concluded “that the facts to be developed and reported to the Congress would be somewhat broader than in a conventional lawsuit because of the unique character of these proceedings and the continuing interest of Congress in them.” It was further concluded that because of the condition of petitioners and for the convenience of some of their witnesses representing the news media, the case would be tried partially in Miami, Florida; and then concluded in Washington, D.C., for the convenience of high Government officials and military personnel. Trial was accordingly conducted in Miami, Florida, February 3 and 4, 1970, and in Washington, D.C., February 10 and 11, 1970, with briefing by counsel completed September 25,1970.
THE DOMINICAN REPUBLIC APE AIR AND THE ROLE OE THE UNITED STATES
6. In late April of 1965, civil strife developed in the Dominican Republic between so-called “rebel” (or “constitutional”) forces, and the so-called military “Junta.” The civil strife developed some time after the exile by the military of President Juan Bosch, and was apparently related thereto. In describing this strife, and the events that followed, every effort will be made to be brief and to employ words which will avoid the appearance of “value judgments” on the merits of this political upheaval, and the response of the United States thereto.
7. On April 28, 1965, the United States landed 400 marines in the Dominican Republic after U.S. authorities in Santo Domingo reported that military personnel were required to guarantee the safety of Americans in that city. Subsequently several thousand citizens of the United States and of other nations were evacuated. By a resolution adopted on April 30, 1965, the Organization of American States (OAS) called for the creation in Santo Domingo of “an international neutral *923 zone of refuge, encompassing the geographic area of the city of Santo Domingo immediately surrounding the embassies of foreign governments * * Such a zone was created by U.S. forces.
8. Then, on May 1, 1965, the President of the United States announced that this country was sending a part of the 82d Airborne Division (about 1,500 men), and additional detachments of marines to Santo Domingo in order to protect the perimeters of the international safety zone. A further troop strength increase of about 6,500 was announced by the President on May 2. By May 3, 10,000 U.S. troops were authoritatively reported to be in the Santo Domingo area. By May 5, the figure had reportedly mounted to 16,000. The 4th Marine Expeditionary Brigade, part of which came from the so-called Caribbean Beady Squadron, landed on May 1. The U.S. forces gradually expanded the area of the aforementioned international safety zone.
OKFICIAL POSITION 03? THE UNITED STATES CONCERNING PRESS COVERAGE OP THESE EVENTS
9. Following as it had the so-called Cuban crisis, the U.S. intervention had resulted in sharp debate and criticism at home and abroad. Because much of the criticism originated from communist sources, the U.S. attitude was to support and even to encourage full press coverage to support its position, and this appears at several points in the record. For example, the statement of Hon. W. Tapley Bennett, Jr., U.S. Ambassador to the Dominican Republic, included in the Subcommittee Becord on the aforementioned H.R. 9752, recites in part:
Mr. Burt had visited the Dominican Bepublic on several previous occasions during my incumbency there as United States Ambassador and was well known to me as a reliable and hard-working journalist. I met Mr. Kennedy, who was working with Mr. Burt, for the first time that morning.
Lt. General Bruce Palmer, Commanding General of United States Forces in the Dominican Republic, was also present at the meeting in my office. Mr. Burt and Mr. Kennedy spoke of their plan to go into the downtown section of Santo Domingo in connection with their reportorial assignment. This was entirely within their *924 rights, and they were equipped with appropriate credentials. * * *
10. In his sworn testimony before the trial commissioner, Petitioner Burt stated:
As a matter of fact, it was the general feeling among the United States officials — and I don’t want to attribute it to anyone, but Ambassador Bennett felt this way and that was of encouraging journalists to go into the zone so they would have a better understanding of what was happening.
This was quite a controversial issue in the United States. The United States was anxious for the people back home to know as much as possible about it, hoping that this knowledge would then justify the United States’ position in the Dominican Republic.
11. The U.S. Government used navy planes to fly correspondents, domestic and foreign, from San Juan, Puerto Rico, to Santo Domingo. The number of such correspondents was estimated to be as high as 200 by the Director of the Joint Information Bureau. The U.S. Government provided this service for all correspondents since San Ysidro Air Field (the commercial facility) was closed to international commerce. It further furnished the transportation and other support services to the press, such as having the navy fly news dispatches twice a day to San Juan as further support for press coverage of these controversial peacekeeping efforts by the United States. Commenting on this at the trial, Gen. Bruce Palmer, Jr., Commanding General of all U.S. Forces, commented: “So that would indicate not only a definite interest, but a desire to have full coverage.”
PERSONAL AND PROFESSIONAL BACKGROUND OE PETITIONERS
12. Petitioner Burt at the time of the incident hereinafter described held the important position of Latin-American editor of the Miami Herald, a newspaper exceptionally involved in Latin American reporting and circulation. Summarizing his professional career, he received a bachelor’s degree from the University of Florida in 1949, and thereafter taught English in a Jacksonville high school. He worked briefly for United Press International, a news wire service, in Atlanta, Georgia, covering general news and rewrite, par *925 ticularly for the radio wire, and then joined the Atlanta Journal as a sports writer covering the Southeastern Conference. Thereafter, he transferred to the Jacksonville Journal in his hometown, and worked there about 4 years both, as a sportswriter and sports desk man. In 1955, he transferred to the Miami Herald as a sportswriter, and subsequently as assistant executive sports editor. Advancement thereafter was rapid. Mr. Burt was transferred to the position of Broward County News Bureau Supervisor, supervising 12 reporters. In 1959, he was returned to Miami as assistant city editor, then night city editor, and finally as city editor. In January of 1961, while serving as night city editor during the Cuban crisis, he volunteered to cover that episode and his work during that period won him a coveted national award for reporting and writing, the “Ernie Pyle” Award which goes each year to the newsman who best exemplifies the style and craftsmanship of Ernie Pyle, a well-known war correspondent during World War II.
13. In 1962, the Miami Herald created a Latin American department and Mr. Burt was named Latin American editor. Mr. Burt began regular travel into Latin America in that job. Of 22 nations in the Organization of American States (OAS), he visited 18 or 19. Latin American coverage is especially important in the Miami area. The position involved administrative supervision of a news staff, as well as personal writing assignments. The function of the Latin American department was not only to produce news for the Herald, but to counsel and advise on how other Latin American news coming in should be treated. His responsibilities as Latin American editor required travel 3-5 months a year, and occasionally for 6-8 weeks at a stretch, covering the various crises in Latin America. He reported on his political assessments of countries, the problems they were having, and their political future. More than 90 percent of the stories written by Mr. Burt were also carried by special arrangement on the Chicago Daily News foreign wire service which, at that time, served about 55 other newspapers. In addition to that, Mr. Burt’s stories were carried by a smaller Miami Herald syndicate operation to a number of other newspapers throughout the country including the Philadelphia Bulletin, the Washington *926 Post and the Denver Post. In addition to the foregoing, he performed some freelance work such as special interest stories and minor magazine work. In 1964, he had begun a book on Haiti, the writing of which was interrupted by the tragic events of May 1965, hereinafter described. (The book was subsequently published in September 1969.) His hobbies included golf 'and fishing.
14. Turning to the career of Petitioner Kennedy, he started in the newspaper business as a reporter in Chatham, Ontario, Canada. He thereafter entered the Canadian Army for a year, following which he joined the Canadian Observer in Sarnia, Ontario, as both a writer and photographer. One year later he joined the Daily Star in Windsor, Ontario, as a full-time photographer. After 2 years there, he moved to the Detroit Free Press in 1945 as a staff photographer. In 1954 he was transferred to the Miami Herald (another Knight newspaper), as a staff photographer.
15. Mr. Kennedy became chief photographer of the Herald in 1962, the position which he held in May 1965, as hereinafter related. The position of chief photographer involved supervision of a photo staff of 14, direction of the department, as well as personal photographic assignments. The Herald had at that time one of the outstanding photo staffs in the country, especially with respect to its color photography, and its Latin American coverage. The only other U.S. newspaper then circulated in major Latin American cities was the New York Times. Half of Mr. Kennedy’s time was spent on assignments out of the office, and he traveled outside this country frequently, and probably more extensively than anyone else on his staff. For example, he had been to Cuba several times, including right after the Castro takeover. He returned to Cuba shortly before diplomatic relations were broken with the United States. Mr. Kennedy received a number of awards for photography from the National Press Photographers Association and from the Associated Press; and the “Green Eyeshade” Award from Delta Sigma Chi fraternity. In addition, he was a local representative for Globe Photos of New York, and also did some local commercial work which produced a supplemental gross income of $2,000-$8,000 per year. Prior to the incidents hereinafter *927 described, Mr. Kennedy was an athletic man, in excellent health, and his sport hobbies included golf, tennis, and fishing.
EXPERIENCE OF THE PETITIONERS LEADING HP TO THE INCIDENT OF MAY 6, 1965
16. On May 3, 1965, Messrs. Kennedy and Burt took a commercial airliner to San Juan, Puerto Pico, and spent the night there. On May 4, 1965, they were flown to Santo Domingo on a TJ.S. Navy plane. Petitioners landed at a military base and were escorted by TJ.S. troops through the aforementioned security corridor which ran through the so-called “rebel” zone to the Embajador Hotel where they took up temporary residence. All United States and foreign correspondents and wire service personnel were quartered there, along with U.S. diplomatic and military officials. Regular press briefings and announcements took place there, and it was the acknowledged “headquarters.” The Embajador had in fact been the customary residence of U.S. correspondents prior to the civil strife in 1965. The petitioners attended a press briefing conducted by our Department of Defense at the Embaja-dor on the evening of their arrival May 4. They learned there that correspondents were regularly going into the “rebel” zone, and interviewing the “rebels.” Both Messrs. Burt and Kennedy possessed the necessary Department of Defense credentials, the only official requirement for such passage.
17. It had always been, and was during this incident, the custom of correspondents staying in Santo Domingo to use a pool of taxis and drivers who parked near the Embajador, and held themselves available for that purpose. Correspondents customarily hired these cars and drivers because the drivers knew the city, and spoke Spanish. With the large influx of correspondents in May 1965, additional cars, i.e., taxis, were made available to meet the increased demand. These cars were marked, as directed by U.S. military and civilian officials, with “PRENSA” (the Spanish word for “Press”), on the front and back windshields, in a clear manner with high letters. The word “PRENSA” was used rather than “Press,” because any potential danger from lack of *928 identification was assumed to be from the Spanish-speaking “rebels,” not from U.S. troops.
18. On May 4, 1965, when petitioners arrived in Santo Domingo, a general cease-fire was in effect between the contending forces. The contending Dominican groups had earlier, namely on April 30, 1965, signed an informal cease-fire agreement which had been largely worked out by the Papal Nuncio. This was confirmed by a formal cease-fire agreement signed by both groups on May 5, 1965, as part of the so-called “Act of Santo Domingo.” Thousands of people went back and forth between the international zone and the rebel zone on May 5th and 6th, 1965, including United Nations personnel. There was a great deal of traffic, both automobile and pedestrian, between the zones. Most of the traffic passed through a checkpoint located at the intersection of Inde-pendencia Avenue (one of the main streets into the old city area) and Pasteur Avenue.
19. All the correspondents went into the rebel zone at one time or other to cover these controversial events, and the custom of U.S. correspondents entering the rebel zone at this time was uniform. U.S. military and civilian officials in Santo Domingo enunciated the general policy that U.S. press representatives were free to travel back and forth through the checkpoints just by showing their credentials, provided that they travelled in properly marked vehicles. For a reporter to adequately perform his professional duties, it was in fact essential to go into the “rebel” zone following the cease-fire, to interview the “rebels.” At the official briefings, reporters received what they would characterize as “handouts.” This was really the first confrontation between the press and the U.S. Government on the propriety of what might be called a “unilateral intervention,” because there was much questioning of whether this was in fact “another Cuba.” Reporters wanted to learn for themselves whether there were communists among the “constitutionalist rebel force.” Just as members of Congress were expressing opposing views back home, these official briefings naturally produced friction and antagonism between the press and the official position.
20. On May 5,1965 (the petitioners’ first full day in Santo Domingo), they hired a car and driver from the aforemen *929 tioned pool of taxis at the hotel, all marked for the correspondents in the proper way and fashion earlier described. Petitioners drove to the aforementioned checkpoint at the intersection of Independencia and Pasteur Avenues. A marine checked their identification, and passed the car through the checkpoint. Petitioners proceeded into the so-called “rebel” zone. Mr. Burt wanted to speak with the “rebel” leader, Colonel Caamano (they preferred to be called the “constitutionalist forces”), but the colonel was not available when they arrived. Mr. Kennedy left Colonel Caamano’s headquarters independently to take pictures, and Mr. Burt spent the morning at the headquarters until the colonel returned, and talked with him for a few minutes. Petitioners returned to the international safety zone about noon. After lunch Mr. Kennedy dropped Mr. Burt off at the American Embassy and proceeded by himself to take pictures of interesting scenes along the security corridor earlier mentioned. Mr. Burt wanted to talk to our Ambassador William Tapley Bennett, Jr., whom Mr. Burt had known from prior trips, but the latter was not available. He therefore spoke with Malcolm McLean, the Public Affairs Officer at the Embassy. Mr. McLean informed him that the Ambassador wanted to see him and asked that Mr. Burt return the next morning to speak to the Ambassador. Mr. Burt then expressed an interest in going to the “rebel” zone and Mr. McLean volunteered to drive Mr. Burt to the checkpoint at Independencia and Pasteur. As a U.S. official, Mr. McLean was not privileged to go beyond the checkpoint, or into the “rebel” zone.
21. Mr. Burt got out at the checkpoint, and walked along Independencia Avenue a few blocks into the “rebel” zone. He was one of a great many people on the street at that time. He decided not to proceed further when he heard shooting break out deeper in the “rebel” zone. He walked down Llu-beres Street (which was one block into the “rebel” zone from Pasteur) towards the ocean at George Washington Avenue. George Washington Avenue runs along the ocean front generally parallel to Independencia. It appears, from a map of the city, to be a long block from Independencia at the point where the cross streets of Pasteur and Lluberes connect these two major avenues. Mr. Burt encountered about 10 or 12 people at Lluberes and George Washington.
*930 22. There was a checkpoint at George Washington and Pasteur (one block in the direction of the ocean from the major checkpoint at Independencia and Pasteur). This was known as checkpoint “Alpha.” A U.S. marine of Latin descent, whom Mr. Burt later determined to be Cpl. Rafael Gerónimo Gandia-Graulau, motioned to Mr. Burt to walk closer to the buildings so the marines would have an unobstructed view down George Washington Avenue looking into the “rebel” zone. Mr. Burt walked one block to marine checkpoint “Alpha” at the intersection of Pasteur Avenue and George Washington Avenue, and spent the rest of the afternoon interviewing the marines at this checkpoint. While Mr. Burt was there, a couple of shots were fired in the general direction of the marine position. It was generally calm aside from that.
23. While at checkpoint “Alpha” that same afternoon (May 5, 1965), Mr. Burt saw a press car come down George Washington Avenue from the direction of the “rebel” zone towards checkpoint “Alpha,” and he observed that it was passed without difficulty at a time when there were sounds of sniper fire. The car was marked with “PRENSA” signs, and although returning from the “rebel” zone to the international safety zone, it was not challenged or stopped by the U.S. Marines. That press car then proceeded to make a right-hand turn on Pasteur up to Independencia and the checkpoint into the international safety zone. The route described by that press car is the identical route Messrs. Burt and Kennedy were attempting to follow the nest day, when the tragedy hereinafter described occurred.
24. Mr. Burt was struck with the impression that the marines at checkpoint “Alpha” were “quite young, nervous, tense, but in general I found them to be very good people, people whom I personally liked and enjoyed spending time with, talking with.” He stayed there trying to find out as much as he could in a general way about what was going on, talked to the young lieutenant in charge, and followed the activities of the aforementioned Corporal Gandia who acted as interpreter for the group. There was a building there, an old home occupied by the American Insurance Company and taken over by the marines. Mr. Burt spent much of the afternoon on the porch of that building with the marines *931 at checkpoint “Alpha.” He remained there until dark, and got a ride back to the Embajador with an NBC television crew also working there. He then attended the nightly press briefing at the hotel.
25. Checkpoint “Alpha” had, on May 4, 1965, been moved to George Washington and Pasteur from Socorro Sanchez and George Washington, as part of the previously mentioned enlargement of the international safety zone. George Washington Avenue does not run in a true east-west direc-ton, but rather follows the coastline. About 400 meters to the east-northeast of the intersection of George Washington and Pasteur is the so-called George Washington Monument, a tall, white marble obelisk which appears in a photo exhibit to be identical in form and appearance to our own Washington Monument. Between Pasteur and the monument, George Washington Avenue is intersected by one street, the earlier mentioned Lluberes, which is about 100 meters from Pasteur.
26. From checkpoint “Alpha” looking east-northeast toward the monument, one has an unobstructed view for about 400 yards down a wide avenue. Facing in that direction, the ocean, with a seawall, is about 30 meters from George Washington Avenue on the right. The street is lined on both sides by palm trees, spaced perhaps 5-10 meters apart and planted in a grassy strip, about 2 meters wide. On the left side of the street looking toward the monument, there is a wide sidewalk (about 2 meters wide) to the left of the aforementioned palm trees. To the left of the sidewalk, there is a strip of grass about 5 meters wide. Running along the left of this strip of grass is a low cement or stucco wall which borders the lawns of some multistory apartment buildings. The armament at checkpoint “Alpha” consisted of a tank and an armored personnel carrier, parked nose-to-nose back of the intersection of George Washington and Pasteur.
27. The foregoing description of the petitioners’ experience and impressions as reporters was confirmed at the trial by other distinguished representatives of the press. Mervin K. Sigale was at the time of the trial Latin American correspondent for the Washington Star, the Miami News, the New York Daily News, and the Westinghouse Broadcasting Company. When the Dominican civil strife erupted, he was the Latin American correspondent for the radio and television *932 networks of the American Broadcasting Company, and one of the first American correspondents to arrive there. He was flown in simultaneously with certain units of the 82d Airborne Division, and took up quarters at the Hotel Embaja-dor. He expressed the opinion that “the nightly [Defense Department] briefings were characterized by their occasional lack of candor” and that it was necessary to maintain mobility within the area of greater Santo Domingo. He testified that in the early days, “if one was already in the downtown area, in the so-called rebel zone, and needed to file [his report], it was sometimes easier in terms of distance and time to get to the cable office in the downtown [“rebel”] zone than it would be to go all the way back through the front lines * * * and back to the Embajador.” He confirmed that this type of movement by press representatives was known to American officials, and no restrictions were placed thereon.
28. Mr. Sigale recalled that military transportation was on occasion supplied to the media, and that one network film crew (possibly that of Ted Yates of NBC) was moved with its equipment over a period of at least several days in an army jeep driven by a U.S. Army soldier or marine. He also recalled the incident of a women photographer, Dicki Shappel, on assignment for Life magazine, having the personal escort of a U.S. captain, who took her on a particular day to a point in the downtown area where action was occurring. Mr. Sigale personally had frequent occasions to pass American checkpoints separating the international safety zone and the “rebel” zone. On those occasions he recalled going through, sometimes unchallenged. However, it was more likely that one would be stopped for credentials and checked by the U.S. officer on duty, “or if we were recognized individually as having previously gone through the checkpoint, there would be no rechecking of credentials, but then we would be permitted on through.” Mr. Sigale’s mode of dress was a sports shirt and slacks “and the only thing that might have protected me was a tape recorder hanging over one shoulder.”
29. Another such witness, Bernard Diederich, who at the time of the trial was Time and Life correspondent for Mexico City, Central America, and the Caribbean, testified that he was employed by Time magazine at the time of these inci *933 dents. He was also then working for the New York Times and NBC. Mr. Diederich was actually residing in Santo Domingo when civil strife developed. He confirmed that the pool of taxis marked “PBENSA” was “the only mode” of transportation around Santo Domingo and that there was daily occasion for U.S. correspondents to cross back and forth across the so-called international line. He said: “If you were covering a story, there were two sides to it, and we covered both sides of the story.” A contrary view was expressed only by Col. George Creel (Bet.), then Director of the Joint Information Bureau in Santo Domingo. He testified:
There was another factor, if I may say so, another factor involved here is the practical matter of reporting, the matter of reporting, news reporting. Now you see, coming out of the rebel zone was words and that were accepted by the press at face value, I believe, and for the most part these — I interpreted them, I felt, as the communist party line. Now if a correspondent was going over and listening to this — I recognized that they had no choice but to accept what these people said, write it up, and that’s the way it appeared in the newspapers. They had no way to challenge, no way to ask proof, and did not ask proof, they accepted what these people had to say, and that was it.
On the other hand, I, briefing the press, was often interrogated, questioned, and asked to prove some of my statements, and consequently I felt that the press, by just reporting in most cases without really checking whether they were a responsible news source on the communist side I thought they were doing the American people a great disservice. And I discussed this with many of the correspondents and pointed out what was happening, and asked at the press briefings just how they conducted their briefing for the press. They told me that they were giving out the words and that was it. They had no way to check, or no way to verify. They just accepted what they said.
Mr. Diederich landed with the marines (having been in New York City on a temporary visit when the trouble arose), and was the first to go into the “rebel” zone. The very next morning, he “went into the so-called rebel zone with two other correspondents. We went in — as a matter of fact, we had no markings on our car, and it was the rebels who went out with *934 a paint brush and painted on my car ‘Prensa’ so in returning we would have no trouble.”
30. Thereafter Mr. Diederich continued crossing back and forth across the line separating the two zones for as long as the hostilities lasted and as long as the troops were there. He did not remember one correspondent who did not go across the “rebel” zone. At no time did any U.S. Government official forbid him from crossing the so-called international line, nor did he know of any other correspondent so restricted.
After having the petitioners’ actions just prior to the tragic incident hereinafter described portrayed to him in the form of a hypothetical question asking whether that represented extraordinary conduct, Mr. Diederich replied, “No. It was very natural, very, very natural, to move back and forth. That was one of the open accesses right there on George Washington.” He testified further than in the early days embracing the time of the incident involved in this case, it was so natural to cross back and forth that he crossed at one time with a United Nations representative. He was aware of OAS personnel and Ambassador Ellsworth Bunker going over into the “rebel” zone. He did not believe that danger, if any, could be anticipated at the hands of the U.S. Marines manning checkpoints. He reluctantly testified that the marines looked younger than the army airborne troops, and that the latter looked more professional.
31. In the same vein, David Kraslow, who was at the time of the trial Washington Bureau News Editor for the Los Angeles Times, described his experiences during late April and early May of 1965 in the Dominican Republic when he was a member of the reporting staff of that newspaper. He was also an early arrival, landing in late April about the same time that Hon. John Martin, Special Ambassador to the President, arrived. He, too, described the transportation used by the press corps as “for the most part imported American vehicles driven by local Dominicans” and occasionally a jeep or, more rarely, military transportation. He described the necessary travel about the city back and forth across the so-called international line regularly performed by him and other correspondents.
*935 32. The procedure going through a checkpoint was described as follows: “Invariably, as I recall — some of this obviously, the details, have to be hazy, but invariably we would approach the checkpoint, stop, the driver would show his credentials, and all of us would flash our credentials to whatever soldiers came up to the car to examine it.” He was asked if, based on the behavior of Petitioners Kennedy and Burt and their taxi on the morning of May 6,1965, as hereinafter described, there was “anything unusual or extraordinary in their behavior which I have asked you to assume?” and he replied, “None whatever. We all did it.” This witness had occasion to go through or pass the marine checkpoint at the intersection of George Washington Avenue and Pasteur Avenue (“Alpha”), and described it as “one of the most common checkpoints passed by reporters.”
33. James Nelson Goodsell, the final witness produced by petitioners on the “climate” for newsmen in Santo Domingo during the period of these incidents, was at the time of the trial Latin American correspondent for the Christian Science Monitor, the same position he held in the spring of 1965. Mr. Goodsell was highly qualified as a witness, and has received several important awards for his work. He arrived in Santo Domingo on April 29,1965, and was there for a number of days, including May 6. He testified that he regularly hired one of the taxis from the pool at the Embajador and travelled back and forth across the international line of demarcation for the so-called safety zone “at least once a day.” He recalled no prohibitions against such travel and reaffirmed the impression that such travel was affirmatively approved by U.S. officials, citing the fact that upon his return from the “rebel” zone, newsmen would be asked, “Well, how’s it going in the zone?”
34. He further testified to trips by American Embassy officials into the “rebel” zone for clandestine meetings with members of the “rebel” command. He recalled that press conferences with Colonel Caamano, the leader of the “rebels,” were attended by U.S. Information Service personnel inside the “rebel” zone. There was even traffic to two restaurants on George Washington Avenue within the so-called “rebel” zone. This reporter also deemed it an “eminently right choice” to utilize local Dominican drivers because “these are people who *936 speak Dominican Spanish and would be able to converse with their fellow Dominicans in a way that a foreigner, even if he knows Spanish, cannot quite do. I felt that there was ultimate safety in this.” The local drivers were also more conversant with the streets and the roads to travel. Mr. Goodsell also understood that standing orders to American military personnel were to permit American correspondents to pass back and forth. After having described to him the actions of the petitioners and their taxi on the morning of May 6, as hereinafter described, this witness was asked “whether anything I have told you in that set of assumptions would have constituted, in your judgment, extraordinary or irregular conduct by American correspondents in Santo Domingo on that day?” He replied, “None whatsoever.”
Petitioners’ counsel offered by way of a “proffer” that other 'correspondents not then readily available (Hugo Wessel; Bernard Collier, New York Herald Tribune; Richard Valerian!, NBC) would testify to the same effect. But counsel could not achieve agreement on this “proffer,” the testimony would for the most part have been corroborative and cumulative, and therefore no additional findings are based thereon.
THE TRAGEDY OF MAY 6, 1965
35. On the morning of May 6th, petitioners arose about 6 a.m. because Mr. Burt had some stories to write for the 8 a.m. Navy press run, and Mr. Kennedy wanted to take some pictures for the same run. Their tasks completed, Mr. Kennedy picked up Mr. Burt in a taxicab he had located. He believed it to be a better car and driver than they had utilized on the previous day. The car was a blue (Nash) “Rambler,” a relatively recent model in good condition. The word “PRENSA” was marked on the right (passenger) side of the front windshield, and on the back windshield, the letters being of white tape approximately 7 inches in height, and covering about 2% to 3 feet of the width of the front windshield.
36. Mr. Burt had received a message that Ambassador Bennett wished to see him (as he had on prior trips of Mr. Burt to the Dominican Republic), so at about 9:30 a.m. they visited the Embassy. Mr. Kennedy also wished to use the visit to receive reassurance on the accepted practice and custom of *937 correspondents and officials passing back and forth into the “rebel” zone. Ambassador Bennett knew “and regarded [Mr. Burt] as a conscientious and objective newspaperman.” He testified:
I was interested in hearing what he had seen and his observation of the situation downtown in the rebel zone. I believe that I may have taken the initiative in asking him to come in, I’m not sure about that, but at any rate they did come to my office on the morning of the 6th, and to the best of my recollection we talked about their experience the day before and their plans to go back into the rebel zone in the city.
Mr. Burt “spent some time talking with him [the Ambassador] about the general situation in the Dominican Republic, his appraisal of the rebels and the Junta and, you know, just in a general way getting his information and his counsel on what he felt the overall picture could be.”
37. The testimony of petitioners on the reassurances requested and received in response to Petitioner Kennedy’s inquiries was as follows:
Q. Who broached the subject at that conversation?
{Mr. Kennedy:] I did. I talked to the Ambassador first. I said, “Mr. Ambassador, we plan to take some pictures in the rebel zone today.” I said, “Will there be any difficulty getting back and forth through the American checkpoints?”
He said, “No.” He said, “There will be no problems.”
He said, “The press has been given the right to go back and forth, providing you have the proper credentials.”
He said, “I’ll let you get it right from the horse’s mouth,” and there was a general there, who I didn’t know at that time, but he had been introduced to us.
The Ambassador then said to the general, he said, “How about that ? Do they have clearance to go back and forth through the checkpoints ? ”
The general said, “Gentlemen, we have issued orders that any accredited press representative can go back and forth through the checkpoints just by showing his credentials.”
He said, “But I’ll re-issue the order.”
Q. What then did he do, if anything, in your presence?
¡[Mr. Kennedy:] Then he went to a little room which adjoins the Ambassador’s office and he got on the telephone. I didn’t hear what he said, but he came back and *938 be said, “Everything is all right. The order has been re-issned and you’ll have no problems.”
38. Mr. Burt identified the general referred to as Gen. Bruce Palmer, Jr., who shortly after arrival was named Commander of all U.S. Forces, Dominican Republic. He recalled the general as saying, “Properly marked cars are free to go back and forth. This is the practice. There will be no trouble. This order has been in effect, but if you feel any concern, I’ll repeat that order,” and after a visit to an adjoining room, “I have repeated the order. You will have no trouble.” At the trial General Palmer agreed that he then felt “that certainly would mean no trouble from our side.”
39. The testimony of Ambassador Bennett and General Palmer is not essentially in disagreement with the foregoing, but does differ in degree of recollection and emphasis. Ambassador Bennett testified:
Q. If you recall, do you remember making any statements to Mr. Burt and Mr. Kennedy to the effect that a trip into the so-called rebel zone would be safe, or would be unsafe, or anything of the sort ?
A. Well, we certainly discussed the conditions downtown. And as I say, there was active shooting going on at the time, so I wouldn’t have said that it was a safe place; on the other hand, I recognized their right to move about as they saw fit in the conduct of their own duties.
Q. Ambassador Bennett, for the purpose of this question, assuming that you did tell Mr. Burt and Mr. Kennedy that you had no objection to their going into the so-called rebel zone, would that have constituted a special permission for these two men, or would that have been merely a statement of a general policy in effect ?
A. Well, I simply would think it was a statement of the general policy. You can imagine the reaction if I had told newsmen they couldn’t go into an area where they felt it was necessary to cover a story.
«!• «H
The COMMISSIONER: I think more relevant from the testimony of this witness would be whether the conduct of these newsmen represented normal or aberrant behavior and what were the general conditions for newsmen at the time in question. And while I’m talking, whether the Ambassador has a general feeling about the policy of the particular representatives of our government there with respect to news coverage, was it to en *939 courage it, discourage it, indifference to it, or what was it.
The Witness : Well, I think we all assumed that there would be full news coverage. In fact nearly, all of the newsmen were brought in originally by official government transport, on a Navy ship, so there was certainly not the slightest idea that newsmen should not cover the situation, and that would seem to me to he evidence implicit to cover hoth sides. [Emphasis supplied.]
By Mr. Pemberton : [Government counsel]
Q. Ambassador Bennett, directing your attention again to the conversation on May 6, 1965, do you recall General Palmer’s participating in this conversation; and if you remember his being a participant, would you describe his role in the conversation ?
A. Sir, I believe he was there for part of the time. I don’t think he was there the whole meeting. To the best of my recollection, he took part in our general discussion of the situation. He was working very closely with me at the time, and anything that came up we tended to handle together, at least to consult about it.
Q. More specifically, do you recall General Palmer’s expressing any views of his own concerning the permissibility of Mr. Burt and Mr. Kennedy going into the rebel occupied part of Santo Domingo ?
A. I don’t recall any, but I wouldn’t for a minute think that he would regard it as not permissible.
Q. Do you specifically recall General Palmer’s perhaps issuing or reissuing any instructions on correspondents’ travel as a" result of a sequel to the conversation?
A. I, frankly, don’t remember that, but that’s not to say it didn’t happen. In fact it would seem likely to me that he may well home done so. [Emphasis supplied.]
On this point General Palmer testified:
Q. Would it refresh your recollection in any way to suggest that such a converation [sic] may have taken place on May 6th 1965, in or near the office of the United States Ambassador Bennett ?
A. I believe it would. I know that Ambassador Bennett had a meeting with you gentlemen on that day, and my CP was next door to the Embassy, in one of those old palaces, and in the beginning my primary communications, as a matter of fact, entered the American Embassy, we sort of combined our communications. So although my CP was next door, in effect, in those early days, I was really operating out of the Embassy, and I spent about as much time there as anywhere else, and I was in and out of Ambassador Bennett’s office practically *940 all day. And I suspect that on the day that the Ambassador had the meeting with these two newspaper men that I either came in there or was outside in the next office. And in both that and the Ambassador’s office, I had direct field telephone lines from there into my own CP, a direct wire, it was a hand crank, and I could talk to my own CP staff, to Bob Linville, and I could pass on immediately any new instructions or new information, or whatever came down from Washington, or whatever Ambassador Bennett and I decided upon, I could pass on to my own CP, and I could stay right with the Ambassador.
40. Thereafter, petitioners left the Embassy, and drove along Independencia Avenue to and through the checkpoint at Independencia and Pasteur (after routine identification). Their purpose was to observe and photograph a burning ship lying on its side along the waterfront. At Independencia and Lluberes (one block into the “rebel” zone), they turned right to the previously mentioned George Washington Avenue and the waterfront, and turned left on George Washington toward the point where the ship was located. They had heard no shots and described it as a very quiet morning. When they got to the corner of Cambronal and George Washington they found that “the rebels or the constitutionalists [had] erected a roadblock” consisting of one or two burned automobiles. They stopped a block short of there and, seeing on one around, got out of the car. Petitioner Kennedy had two cameras strapped around his neck, and Petitioner Burt carried a stenographic pad, 3 or 4 inches wide and 6 to 8 inches long, on which he proceeded to take notes as Mr. Kennedy took pictures. Both men wore bright sports clothes purchased in Miami “clear and easily distinguishable as such.”
41. A young Dominican approached them dressed in dark clothes and identified himself as a Dominican Bed Cross worker. When told they were members of the press, he advised them to leave, indicating a “rebel” with a rifle standing on top of a restaurant. After a brief conversation with the “Bed Cross” worker, the man on top of the restaurant approached to the edge of the street. Petitioners thought it best to leave, reentered the car, turned around, and proceeded back to the international zone on George Washington Avenue. Petitioners testified that at no time did either of the two metí *941 described, the Dominican Bed Cross worker or the man with the rifle, come close to their car.
42. Mr. Burt decided there might be an opportunity for a good story in a further interview of the marines at checkpoint “Alpha” (George Washington and Pasteur), where he had spent most of the prior afternoon. He wanted to find out how they had passed the night. Mr. Burt thought he was acquainted with them by this time, and “wouldn’t be a stranger.” When there the previous afternoon, he had noted the marines kept George Washington Avenue under surveillance for its full length, because that was the only approach to their position. He said, “They used binoculars for it, and they were, you know — they were just studying everything that moved in that area. It was clearly visible by binocular and, as a matter of fact, by the naked eye. The distance wasn’t that far. You could see down there.” A photograph in evidence tends to confirm this fact.
43. The taxi proceeded slowly down George Washington toward the checkpoint. Its maximum speed was 25 mph, but for the most part its speed did not exceed 10 or 15 mph. The weather was clear, bright and warm and the windows in the car were open. The previously described palm trees on either side provided shade on this picturesque avenue. As they approached “Alpha,” Petitioner Burt observed that the conditions and armament at the checkpoint were the same as he had observed on the previous afternoon. There was no gunfire within petitioners’ hearing. They testified, “It was so quiet that it was striking.”
44. When they were about a block away at Lluberes and George Washington, Mr. Burt, who was seated in the back seat, noted that a marine whom he recognized as the Spanish language interpreter with whom he had conversed on the previous day, had walked across the street and signaled them to stop. This marine, Corporal Gandia, had taken up a position behind a palm tree, and about six or eight other marines, all armed with rifles, had also taken up positions behind palm trees across Pasteur Avenue from the checkpoint.
45. Corporal Gandia’s stop signal was the normal traffic signal; arm outstretched, palm of the hand facing petitioners. Mr. Burt and Mr. Kennedy testified that at no time then or thereafter did they receive any voice command whatsoever, in *942 Fnglisb or Spanish. The taxi driver stopped immediately at a point within the last block between Llnberes and Pasteur. Following that, Corporal Gandia “gave us a signal to come forward, like this.” The witness Burt demonstrated a gesture with the arm, palm in and hand moving toward himself. With that the taxi moved slowly forward, barely a yard or two. Then Corporal Gandia gave a hand signal, arm outstretched, palm facing the car and pushing toward it, which petitioners interpreted to mean “stop” or “back up.” The taxi backed up. As soon as they began to back up. Corporal Gandia repeated the above described signal to come forward. (Arm outstretched, palm in, gesturing toward himself.) The taxi moved forward less than a car length. As the car began to go forward, Corporal Gandia again gave the “stop or back up” pushing palm movement. Petitioners observed, and believed their driver also did, that each time the taxi moved forward, the marines raised thier rifles to their shoulders and leveled them at the car. They were convinced the forward movement produced this reaction and for the first time became concerned.
46. Mr. Burt testified:
* * * I became concerned for the first time because I felt I knew these people and, you know, that I just couldn’t imagine them shooting us. It was just the fur-therest [sic] thing from my mind, because we were responding precisely to the signals they gave us.
When the rifles came up that time, the driver put the car in reverse, in response to our final forward movement. The rifles came up and the driver put the car in reverse because each time we moved forward it drew that response.
Q,. Having put the car in reverse, did he back it up ?
A. He backed it up sharply.
Q. He backed it up sharply and went straight back or in some other direction ?
A. The intention simply was to back to the corner, to Llnberes there, and back out of the Marines’ line of vision down the street and so the street again would be clear. We assumed that, you know, by removing the car from that, there would be no problem.
Q. By removing the car you would remove their concern, whatever it was ?
A. Yes. Their concern, their aggressive concern that began to disturb us is when we began to move forward.
*943 Q. As your driver put your car in reverse and backed sharply to the right, I take it-•_
A. Yes, in that fashion, to the right.
Q. As he did so, what did the Marines do ?
A. They opened fire.
Q. Without attempting to make any precise ballistics count, what was the extent of that fire ?
A. It was extensive. I don’t know how I could describe the extent of it. There must have been half a dozen Marines firing rifles and two macbineguns.
47. Mr. Kennedy was seated in the front, next to the driver. He, it will be remembered, had not been to checkpoint “Alpha” on the previous afternoon, and his attention had been focused on Corporal Gandia whom he expected to approach the car to check their identification. He, too, observed the hand signals described by Mr. Burt, and similarly interpreted them. Also, when the rifles were raised each time, Mr. Kennedy instinctively ducked below the windshield, perhaps the only one in the car who did so. He remembers saying to Mr. Burt, “What in the world does he want us to do?” and the reply: “I don’t know what he wants us to do.”
48. He testified as to the moments immediately preceding the shooting:
A. The driver again started the car forward.
Q. At what speed and for what distance?
A. Very slow speed. The rifle came up a third time in the firing position. At that point the driver, apparently completely confused, as I was — I hit the floor at this time. He put the car in reverse and started backing it up at a rapid rate.
Q. In which direction, if you know?
A. Well, I-
Q. That is to say, was it backed straight back or at an angle ?
A. It seemed to me that he was turning in sort of a V-position.
Q. To his right or left rear ?
A. To his left rear.
Q. Go ahead.
A. And apparently he wanted to make a V-tum and leave the area. As soon as he started backing up, I guess he had gone back — I was on the floor, so I don’t really know how far he had gone back.
Q. But you knew the car had travelled some distance in a sharp backing movement ?
*944 A. Yes.
Q. Wbafc then occurred ?
A. Then I heard machinegun fire and I heard the car being hit.
Q. Now, the first fire which you heard and which you felt the car receive was automatic fire ?
A. Yes. It was either a machinegun or automatic rifle.
Q. Then what occurred?
A. I felt the car hitting something. I never did see the driver leave the car, but I was suddenly aware that he wasn’t there any longer. The car was stopped.
49. From the time the car was first stopped until the firing began, Mr. Kennedy also testified that there were no shouted signals in either English or Spanish. He stated: “No. There was no shouting at all. It was a very hot day and the windows of the car were down, at least mine were down. There were no sounds at all.” He had heard no firing at all, in all of their travel that morning until they were fired upon. “You could hear it [firing] for several miles, and for the entire morning it had been very quiet.”
50. At this point, findings will be made as to the testimony of the marines regarding the events just preceding the shooting, since their testimony is at least partially in conflict with that of petitioners and that conflict will have to be resolved. Checkpoint “Alpha” was manned by a part of one platoon under the command of then Lt. Richard Dunn Barba, who at the time of this incident had been commissioned about 11 months. At the trial he acknowledged being, on the day of the incident, a relatively young, junior, inexperienced field officer. Since this incident preceded the major buildup in Vietnam, the marines at this checkpoint had no prior combat experience. As of May 6, 1965, U.S. forces in Santa Domingo had incurred total casualties of 10 killed and 67 wounded among both army airborne and marine troops. For an evaluation of this as a casualty rate, U.S. Commanding General Palmer agreed this ratio was very, very slight. It will be recalled that a total of about 16,000 troops were reportedly present in the Santo Domingo area by May 5th.
51. The orders issued to the marines at checkpoint “Alpha” during the period of this incident and while a formal ceasefire was in effect (the aforementioned “Act of Santo Domingo”), were to fire only if fired upon, and then to return *945 fire only to tbe point from wbieli tbey were receiving fire, and only to the extent necessary to defend themselves. (Later, in June, the orders evolved into instructions not to fire back at all.) They had further official orders to satisfy themselves as to the credentials of U.'S. correspondents and, subject to that requirement, to allow them free passage.
52. The aforementioned Corporal Gandía (a staff sergeant at the time of trial) had been in the Marine Corps about 3% years when this incident occurred. He has a rating as “interrogator-translator” in Spanish, among other languages. He was flown into the Dominican Republic from Camp LeJeune, North Carolina, where he was the chief instructor in the Spanish section. He arrived on April 27,1965, and was immediately assigned to checkpoint “Alpha” at George Washington and Pasteur. He testified that on numerous occasions “we received quite a bit of sniper fire” and he recalled receiving sniper fire on May 5, and early in the morning of the 6th of May.
53. Sergeant Gandía recalled an incident on the afternoon of May 5 when two persons approached the checkpoint on a single bicycle, at a time when he was 25 meters in front of the checkpoint. He was there so he could stop people before their arrival “to protect the tank and the amphibious vehicle that was there * * * go back to the checkpoint and check with the Patrol Commander and he would inform me what we wanted done.” On the occasion of this “bicycle” incident, he was on the ocean side of the street with three others, and he had two Dominican Nationals stationed on the other side of the street. When the people on the bicycle were about 25 to 50 feet away, he directed them to halt in Spanish several times. His testimony of what then transpired follows:
* * * When they wouldn’t halt, we started receiving incoming sniper fire at the same time. Once we started receiving fire we opened fire on them. After the fire subsided there was no trace of the people. I couldn’t be sure whether they were shot off the bicycle. In my estimation one of the persons on the bicycle was shot off the bicycle. But we did not go out to retrieve their bodies, and so we never had any traces of the bodies afterwards.
54. Sergeant Gandía recalled and reaffirmed the conversation with Petitioner Burt on May 5. His description of traf *946 fic “via or through” checkpoint “Alpha” was that it was nonexistent; but he later inconsistently described the procedure that he employed in stopping and interrogating people who approached checkpoint “Alpha.” The procedure he described was to search the vehicles and passengers, check their ID cards and let them go up to that major checkpoint (at Inde-pendencia and Pasteur), and go through. Sergeant Gandia recalled seeing petitioners’ blue car for about 20 minutes prior to the time that it was fired upon. He was then at a point next to the tank, utilizing his binoculars. He testified:
* * * Once I saw the car down in the vicinity of the George Washington monument down there, I moved ahead of the checkpoint with my Dominican Nationals, had several on the opposite side of the street, and again I had a couple on my side of the street, and I mot-ed up, I’d say, about 25, 30 feet ahead of the checkpoint, behind a palm tree, and I continued to observe the movement down by the George Washington Monument.
He later corrected 25 or 30 feet to 25 or 30 meters.
55. From this vantage point he continued to observe the automobile through his binoculars. He testified to seeing “troop movement” around the automobile. He could not tell whether the persons he described as “troops,” carried arms. He testified that he saw the occupants of the car get out and start to talk with those people next to the George Washington Monument and he saw them get back into the car and start moving toward the checkpoint “so the Lieutenant told me to stop the car.” (The aforementioned Lieutenant Barba.) At that point, then Corporal Gandia was about 30 meters in front of the lieutenant and the checkpoint. He confirmed petitioners’ estimate of the vehicle’s speed as “about 10 to 15 miles an hour.”
56. As the vehicle approached, he testified, he came out from behind the palm trees and got out toward the sidewalk and signaled for it to halt using his right hand palm forward. His description of the hand signal was identical to that of petitioners. He said that he “indicated for the vehicle to stop orally and with hand signals, in Spanish, and both in English.” He testified 'that the vehicle stopped just ahead of him at an angle, “I would say about ten or -fifteen feet away from me * * * and then I told the occupants of the *947 car to get out of the car in Spanish and in English.” [Emphasis supplied.]
57. At that point, he testified, he did not observe any marking on the windshield or elsewhere on the automobile. A large photograph admitted into evidence showing the car immediately after the shooting, illustrates the “PRENSA” marking on the front windshield as previously described. He could not tell the nationality nor the dress of the people inside the car, nor the kind of equipment they were carrying. He further stated that he could not tell this either when he was previously observing them with binoculars while they were at the George Washington Monument. Sergeant Gandia then testified that “[f]inally the driver of the car started to get out of the car. He opened the door.” He stated this occurred about poe minutes after the automobile had stopped. In the interim he said he had given orders to the occupants of the car about three or four times.
58. His crucial testimony at this point is as follows:
As he started to get out of the car we started receiving incoming sniper fire, and as we started to receive sniper fire the driver panicked, it’s my estimation he panicked, because he jumped right back into the car, he shut the door, and as he did this he put the car into reverse, I mean just wide open, and as the car started to pull back the machine gun on top of the tank opened fire at the car.
59. The incoming sniper fire which he described came, he testified, from around the George Washington Monument. In some rather confusing testimony at this point, he stated that the people he observed petitioners talking to at the George Washington Monument, “moved up with them and stayed behind the Washington Monument down there.” But in response to a leading question from counsel, he immediately thereafter stated that two or three people appeared 'to accompany the vehicle, although he could not tell whether the people he allegedly observed accompanying the vehicle were carrying any weapons. He stated that the marine fire did not begin until the driver started to back up the car and had neared the next corner (apparently Lluberes). The incoming fire which provoked the marine fire was described by Sergeant Gandia as about four or *948 five rounds of semiautomatic rifle fire before the marines started firing; and about three or four rounds after they began firing. He felt that it came from no more than two weapons. He testified that he fired at the blue automobile, and that after the automobile came to rest “we ceased firing.”
60. Sergeant Gandia testified that he observed the ^PRENSA” markings on the front windshield when he went down to the car later. With regard to his inability to see the markings from 10 or 15 feet away during the 5-minute period he earlier described, he explained, “I was at an angle from the car, I was not looking directly at the car, and when the car was headed up the street I was looking through binoculars, and all I could see was a white windshield. Now the sun might have been reflecting off of it, but I couldn’t — all I could see was the sun on the windshield. It was a bright sunny day.” He stated that the oral orders that he gave the occupants of the car from 10 or 15 feet away were shouted, and not merely in an normal conversational tone, and that he got no response.
61. On cross-examination, he testified that no one gave the order to open fire on the car with the machinegun. He acknowledged that standing orders were to fire at the spot “from which you were receiving fire”; and that they were not receiving fire from this car. (In a minor inconsistency, he acknowledged that immediately after the incident he had reported the time of the shooting occurrence as 11:25 a.m.; whereas at the trial he testified it was at 10 a.m.). When asked why he fired at the car when the incoming fire which he observed was coming from the George Washington Monument, he testified:
Because I assumed that the people in the press car were just as equally guilty, or just as much rebels, as the one that was shooting at me.
62. He acknowledged that what he had observed at the Washington Monument was not furtive nor secretive, and that the occupants of the vehicle, as he observed them, were not dressed in any kind of khaki or irregular uniforms. He acknowledged further on cross-examination that on the prior day, May 5, when the marines directed fire at the earlier described people on the bicycle, that the incoming fire had not *949 come from the bicycle, and that the people on the bicycle were “very young.” He denied ever pointing his rifle at the blue car, prior to the time that he fired upon the car.
63. During the period of firing, Sergeant Gandia admitted firing 40 rounds with his M-14 rifle; about five or sis of these rounds at the car, and the remainder toward the monument. Sergeant Gandia’s testimony was concluded as follows:
I thought the car was being used as a decoy, that it was sent up there to get our attention, to get us to come out into the open, and once we had come out into the open they could start firing at us and get us with snipers, which is what happened the day before with the bicycle. Every time I told the bicycle to halt nobody halted, they kept coming forward, and finally they wouldn’t stop, so we had to fire on them, on the bicycle.
64. The next marine witness was Sgt. Edward Stephen Winstine, Jr., a veteran of 17 years in the Marine Corps. He came ashore in Santo Domingo on either the 3rd or 4th of May 1965, and immediately was sent to checkpoint “Alpha.” He remembered some sniper fire on the night of May 5 and again at 7 or 8 a.m., on the morning of May 6. He too, recalled orders not to fire unless fired upon and added, “the only thing we could fire was small arms.” He testified that he first saw the blue car while looking through a range finder on the tank; that he also saw a truck with a Dominican in the back of it with a rifle, and “a whole bunch of people gathering around it * * *. Then the next thing I saw was the car coming our way.”
65. Sergeant Winstine stated that a range finder magnified that which was viewed through it so that at “a thousand meters I could see you like I see you now [talking to counsel] I could make out your features, I could determine that you were a person, not a tree, or anything like that.” He did not watch the car constantly but looked at it only a minute or two, and observed it as it moved down George Washington Avenue toward the checkpoint.
66. At this point Sergeant Winstine’s testimony is inconsistent with that of Sergeant Gandi'a. He states: “What made me observe it — because I was up on the porch, and there was sniper fire and I come running off the porch.” Following the sniper -fire he observed the blue car continuing toward their *950 position. He was not sure but thought there was a “couple walking along behind the car but I am not sure.” He took up a position across the street, down on his knees and observed the car coming forward at an estimated 10 or 15 miles an hour. From where he was “it appeared that Sergeant Gandia waved it down and was shouting at it, and also some of the natives were shouting at it, and it kept coming forward, and it loohed like it passed Mm [Sergeant Gandia] from where I was at.” (Emphasis supplied.) He heard Sergeant Gandia say something to the occupants of the car speaking in Spanish and “yelling in English at them and waving his arms.”
67. He could not see the occupants of the car nor the markings on the windshield. It appeared to him that from the moment Sergeant Gandia gave the car some signals “it stopped, and it started rolling forward for about five yards, and the next thing it was going in reverse, and then we started getting more fire coming in. The next thing I heard a machine gun going off.” (Emphasis supplied.) (It is desired to note that the trial commissioner was obliged to voice some misgivings about the “leading” questions being put to the witness at this point in his testimony.) The incoming sniper fire at that point was estimated by the witness to be four or five rounds from a semiautomatic rifle, small caliber. When the machinegun went off, this witness started shooting at the tires of the car and toward the monument. It was his opinion that the point of origin of the incoming fire he testified to was 75 or 80 meters back of the car. He did not observe the occupants of the car nor the markings because it was a sunny day. He was not sure, but thought he remembered Mr. Burt’s visit on the previous day. He expressed the opinion that the incoming fire originated from the area of the car, or back of the car. On cross-examination, it was pointed out that since the car was approaching from a generally easterly direction and this was the morning, the sun would be back of the car and not reflecting off of the windshield. But the witness said that he was troubled by reflected glare.
68. Sergeant Winstine estimated that when he was earlier looking at the blue car in the vicinity of the George Washington Monument through the range finder on the tank, it was *951 about 700 meters away, which is closer than the 1000 meters which he had earlier used to describe the degree of magnification provided by the range finder. But he could not recall seeing markings on the car, nor the dress or equipment of the occupants although he “saw a lot of people standing around.”
69. On cross-examination, Sergeant Winstine acknowledged an inconsistency between his testimony at this trial, where he had described incoming fire as first attracting his attention to the car while it was enroute from the Washington Monument to the point where it was stopped by Sergeant Gandia; and his official report immediately following the incident when he described the first incoming fire as Sergeant Gandia had described it, namely, as occurring about the same time the car backed up following .the 5-minute experience with Sergeant Gandia and his hand signals. He nevertheless believed his testimony at the trial, some 5 years after the event, to be the more accurate. He acknowledged that although he was uncertain as to whether or not he was receiving fire from the car he and the others fired upon the car at a time when the car was backing up. This witness had had no combat experience prior to the Dominican incident. He considered the machinegun on the tank to be a “small arm” within the definition of the orders lie earlier described limiting them to the use of small arms. He concluded, in answer to questions from the trial commissioner, that first the car started backing up, then he heard the sniper fire, and then the machinegun and everybody else opened fire.
70. The next marine witness was Sgt. Delmar L. Schmitz. He was, at the time of this incident, a veteran with prior Korean experience. His description of the incident was as follows:
I was right near a wall to the left side of the tank, facing the monument, at that time. The car was coming up the road real slow, about 75 to 100 meters from the tank, and all of a sudden we got incoming small arms fire, three of four rounds, five. The car then proceed to back up. The driver’s side got out, somebody got out, and Captain Barba hollered “Cease fire.” I immediately hollered at the tank to cease fire.
Again (after some discussion as to whether or not counsel was excessively leading the witness), he recalled that Ser *952 geant Gandía was about 60 to 70 meters in front of the checkpoint, and that he could see him putting his hand in the air. He could not hear any words spoken. He acknowledged that the car came to a stop, or “almost a dead stop, as best I can remember. I don’t remember that too well.” On the sequence of events, he stated:
The car started to back up, at the same time we got small arms fire, the machinegun then opened up on the tank, and the vehicle backed m a right turn direction, to his right rear, hitting the embankment or the wall near the street there.
In response to a question by the trial commissioner, asking him once again to describe the sequence of these events, he then testified:
A. The small arms fire, and then the — the small arms fire, the backing of the car almost simultaneously, and within a minute or less Captain Barba had hollered “Cease fire,” and I hollered “Cease fire” at the tank.
Q. Before the cease fire there must have been some firing, and you haven’t mentioned that.
A. The incoming?
Q. No, the outgoing fire ?
A. The outgoing fire was almost simultaneously as the incoming fire. It was hard to tell just where these rounds were coming from. [Emphasis supplied.]
71. This witness also failed to see the markings on the car or the occupants. In response to later questions by the trial commissioner, he stated, as he had earlier stated, that he first noticed the car between the George Washington Monument and the checkpoint. But, inconsistently, he thereafter testified as follows:
Q. And it was underway at the time ?
A. When I first saw it, it was stopped. Then the firing started within a couple of minutes after it had stopped, and it started backing up.
Q. You said you first saw it when it was stopped ?
A. Yes.
Q. Up in front of the checkpoint ?
A. It was gradually coming down the street, the best I’d say — I couldn’t say, your Honor. It coming near us, or stopped.
72. It seemed to this witness that the incoming fire was originating from the car, or immediately thereabouts. He *953 could not say for sure. He added the testimony that nobody gave an order to fire, and that he, in fact, did not fire his weapon because he was armed solely with a 45-caliber pistol, and it was not his job to fire, but rather to control the fire and direct the men. The machinegun on the tank, he stated, was manned by a corporal whose name he did not remember. He acknowledged that at the time of the investigation immediately after the incident, he had said “just where the incoming rounds came from is uncertain to me.”
73. The next marine witness produced was the commander of the troops at checkpoint “Alpha,” the aforementioned Capt. (thenLt.) Bichard Dunn Barba. He was about 23 years old at the time of this incident, and had started active service in the Marine Corps on June 3, 1964. He, too, was assigned to “Alpha” around the 4th of May. He first saw the blue car about two or three blocks away, and was looking at it through binoculars because “there was a lot of activity down there. There were several men down there that had rifles.” He stated that before he had gone to checkpoint “Alpha,” there had been several incidents at the prior roadblock at which he had been stationed (Socorro Sanchez and George Washington), and that at one time a pickup truck came by and dumped dead bodies off in front of their roadblock. He also mentioned the “bicycle” incident earlier described by Sergeant Gandía. He could not recall whether checkpoint “Alpha” had received any sniper fire earlier that morning of May 6th, as mentioned by prior witnesses, but he recalled some the night before, on May 5th.
74. In describing the “bicycle” incident he stated there was a youth of about 16 years of age on it, and one of his troops spotted a man with a weapon on the seawall and he thought at the time it was a “lure.” The man on the seawall pulled out a pistol, fired a couple of shots and left. He did not believe the marines fired at the bicycle rider but that “[w]e did fire on the man that was down on the seawall.”
75. Captain Barba, in describing his first observation of the blue car, stated he was viewing it with 7 x 50 standard field binoculars. The car was stopped, “and there was a bunch, I would say about five to six people, around the car.” It looked to him like one or two of the people in the car had *954 gotten out and they stood there “maybe ten to fifteen, twenty minutes, more or less talking to these people” at the monument. Then they got into the car and the car started coming down George Washington Avenue “very slowly, and about three or four of the people that were down pass the monument [one of whom he believed had a rifle], sort of trailed down behind the car, and as the car kept proceeding down they stopped at the 'Washington Monument and the car kept coming.” [Emphasis supplied.]
76. His detailed narrative follows:
At this point I realized that the car was going to come down to our roadblock, so I sent the interpreter, Corporal Gandia, out with — I believe he had two or three Dominican Nationals with him, and he went out about 75 meters in front of the roadblock so that when the car came down he could stop it at that position. We tried to stop these cars away from the roadblock, in case they might have had Molotov cocktails or something like that, so they could be no threat to the tank or the amtrack.
The car kept coming down, and when it got down I guess in front of the Corporal he motioned him to halt and the car came to a halt. At this time I was just about 20 meters behind them by this fence on the — just on the other side of the road, and I told him to ask them to get on out of the car and come forward so we could question them and find out who they were.
At this time, I could not tell who was in the car, and I saw no “Prensa” signs on the car of any sort. The Corporal told them a couple of times to get out of the car, and I believe he motioned them to get out, but at this time nothing happened. There just seemed to be sort of a lull there of two, three, four minutes, I can’t really tell the time, just nothing happened, and then all of a sudden it looked like the door on the driver’s side started to come open, and just as this happened we took about four or five rounds of sniper fire from — I believe it was down the street, down by the Washington Monument. I heard the reports and I heard the bullets going over my head. At this time, or almost simultaneously as these bullets went over my head, I got down behind the fence, and as I popped up — -I heard the screech, and as I looked up the car was going back in full reverse, the driver had just stepped on it and took off as fast as he could, and just as he started, as he was moving back, I believe the 30-caliber on the tank, it might have been *955 the LVBP, I believe it was an automatic weapon, from the roadblock opened np, and as it opened up, simultaneously everybody started firing that was on the roadblock.
As soon as the people started opening up, my biggest concern at the time was the fact that the Corporal and some of the Dominicans were out in front of the road- ' block. So I immediately yelled “Cease fire,” and sort of passed the word back. _
_ Now the car was hit pretty bad and it swerved off, I guess it went down 200 meters or so down the road ana swerved off to the left, went up on the sidewalk, and smashed into the wall.
77. Captain Barba confirmed Sergeant Gandia’s description of his hand gesture to stop the car. He believed that it was just by hand signal and could not recall any oral command. After the car stopped, Captain Barba recalled Sergeant Gandia instructing the occupants to get out of the car in both English and Spanish and that there was no response, “So I yelled at him to tell them in Spanish to get out of the car, and there was still no response. He also motioned to them to come out of the car, and there was no response to any of his — .” He described Sergeant Gandia’s gesture of moving the palm of his hand toward his face as a signal to get out of the car, rather than as one to come forward.
78. Captain Barba’s testimony continued as follows :■
Q. Now after the car had stopped and after Sergeant Gandia had given these instructions, what happened nest?
A. Nothing really. There was sort of a lapse of time, and all of a sudden it seemed the driver started opening ■his side of the door, and during this — he sort of opened his door and when the door swung open and that’s when we took the four or five rounds of incoming.
Q. When the driver opened his door did you see the driver at that point ? _
_ A. I didn’t see him at that point because we took incoming and I had ducked down, and when I looked back up the car was already going in reverse.
Q. And did the Marines back at the intersection open fire?
A. Yes, they did.
Q. Did you, yourself, fire ?
A. No. I had a 45 and never took it out.
*956 Q. Did you bear the occupants of the car say anything in response to Sergeant Gandia ?
A. No, I didn’t. That’s what was so confusing, because nothing was said at all, everybody just — from what I could tell — just sat in the car. There wasn’t any type of activity that I could see.
Q. Did you see the occupants of the car; except for •this move that the driver made which you have described, did you see the occupants of the car make any other movements inside the car ?
A. No. Like I said before, I couldn’t see inside the car that well.
Captain Barba thought the “incoming fire” was originated at the Washington Monument. He testified further that Sergeant Gandia could not have been standing more than 10 or 20 feet from the car when it stopped, and that he was about 20 meters behind Sergeant Gandia and about the same distance from the car (from a different angle, apparently).
79. As previously mentioned, Captain Barba had been commissioned about 11 months prior to this incident and 51/4 months of that period had been spent at basic school. He acknowledged that no order was gwen to open fire at checkpoint “Alpha.” Captain Barba’s report, immediately following the incident, stated that there were no press signs on this vehicle; but that it was brought to his attention later that same day that there were press signs on the car. Captain Barba confirmed that his orders on the 6th of May “were to fire only if fired upon, to return fire only to the point from which it came.” He stated that “we were under an order to return fire if engaged by the enemy.” When asked if he was engaged by this blue car, he said:
Well, to this day, I don’t really Jenow whether we tools ■fire or not, except for the fact that they had U.S. reporters in there, which I found out later. The sequence of events — when the car came open and that guy put it in reverse and at the same time we received fire, there is usually a demonstration for fire coming from the car. [Emphasis supplied.]
He acknowledged at the time of the trial that he knows now that he took no fire from the car.
When it was pointed out to him that several hundred rounds had apparently been fired from his position, since *957 80 bullet holes were counted in the press car alone, his testimony was:
I believe most of it was aimed at the car. [Emphasis supplied.]
80. Captain Barba acknowledged that press correspondents were entitled to come up to his checkpoint, turn right on Pasteur, and proceed to major checkpoint at Independencia and Pasteur. He expressed the opinion that the gesture described by Sergeant Gandia with arm outstretched moving the palm toward his face, was a signal to get out of the car, not a signal to advance. As for oral instructions, Captain Barba testified with regard to Sergeant Gandia, “He said, I believe, ‘Get out of the car,’ ” but he could not quote him and was not sure.
81. On redirect examination, Captain Barba testified that it was necessary for someone to give the oral order to fire before his personnel at the checkpoint were privileged to open fire, and that he had conveyed that restrictive order to his men. But he said it would constitute an exception when he was out in front of the roadblock “[a]nd when we took the incoming fire and the car backed up, people from the roadblock fired without my orders.”
82. Captain Barba provided the following answers in response to questions placed to him by the trial commissioner:
Q. When the door on the driver’s side started to open, wasn’t that consistent with the instructions that Sergeant Gandia had been giving him ?
A. Well, yes, sir, it was. The puzzling thing about the whole situation there is that they were — nothing was happening, the car had come to a stop, and the interpreter was motioning and telling them to get out, and there just seemed to be a period where the people in the car were not reacting one way or the other. Then the door went open, and just as the door went open we received sniper fire. And I was off on the side, to where I didn’t personally feel that the sniper fire was coming from the car, where I could see where the people that were in the front couldn’t start this from the car with the door open, the car all the time taking off in reverse at full, full speed.
Q. It did that simultaneously, or after the firing started ?
*958 A. Yes sir. The sniper fire came in, and almost as soon as that sniper fire came in, I ducked down behind the wall, and the street — and I looked up and that car was going in reverse, and the troops at the roadblock with an automatic weapon had opened up, hadn’t opened up until that car was going in reverse.
Q. From a professional point of view, how would you evaluate the man behind the first weapon that opened up on your side?
A. Well, at the time I was very 'perturbed because of the fact that I had not given the order to open fire. In fact we had people out in front of the roadblock. I think there were young troops sitting up there, and I believe he felt he was warranted in what he did. He thought he was taking fire from the car and his orders were to fire if fired upon and maybe — I’m not real sure, I can’t think for somebody else. But I was perturbed anyway for the reason that at the time of course I didn't Tcnow who was in the car, and the fact that they opened fire without my orders. [Emphasis supplied.]
83. Over objection by petitioners’ counsel, Sergeant Gandia was recalled to the stand to reexplain his hand signals because of questions which had arisen in subsequent testimony as to their meaning. The objections of petitioners counsel were based on the fact that the record spoke for itself, and that Sergeant Gandia would have meanwhile had an opportunity to discuss his prior testimony with subsequent witnesses. In any event, this testimony on recall turned out to be of little consequence, since Sergeant Gandia described the gestures exactly as he had in his initial testimony. He added that when the Dominican driver started to get out of the car, as he had earlier testified, he recognized him as a Dominican.
84. Obliged to reconcile the partial conflicts between petitioners’ and the marines’ versions, as above summarized, of the crucial events which led to the shooting, it is concluded that petitioners’ version is the more plausible and believable and that it is to be preferred for the following reasons:
A. The testimony of the marines, as witnesses, was inconsistent within itself and this was selfdemonstrable when it was being heard; and later from an examination of the transcript. Their testimony was also less credible, when compared with the circumstantial evidence in the record, and with the physical conditions *959 and distances described by witnesses and confirmed by photographic exhibits and charts.
B. The gestures described by then Corporal Gandia were obviously ambiguous, contradictory and confusing, and would not be known to the average person as hand signals to dismount.
C. If the hand signals were in fact accompanied by “shouted” signals to dismount, and this continued over a period of 5 minutes, from a distance of only 10 to 15 feet, it is incredible that petitioners would not have promptly complied. They would, in fact, have no reason for failing to comply.
D. There is no evidence that if there was “incoming” fire (and there is a conflict as to this), that it was originating from the little blue Bambler only 10 to 15 feet in front of Corporal Gandia.
E. The testimony that some “rebels” followed the car from the Washington Monument back toward the checkpoint is also incredible, and inconsistent, since they would have been the natural objects of the marines’ return fire, and there is no evidence in the record as to them and their fate, just prior to or after the shooting. In fact, Captain Barba’s version had them remaining back at the monument.
F. Taking into consideration the photographs in the record, the distances involved, and the degree of magnification afforded by the binoculars and range finder utilized by the marines, it is difficult to understand their failure at any time prior to the shooting to see the identification on the windshield of the vehicle, which was admittedly there to be seen. Nor was there any basis for being alarmed by it.
G. The firing by the marines was in violation of their own general orders during the period of this cease-fire, and in further violation of their right to fire without an order from Captain Barba in immediate command at the checkpoint.
H. The quantity of fire by the marines was grossly excessive under the circumstances, even assuming their versions to be correct, which I do not.
85. It is very useful at a trial, and well recognized as such, to examine the demeanor of the witnesses as they testify. In this connection it must be stated that petitioners were unusually impressive. Despite their severe injuries, later described, their testimony was dispassionate and restrained, and displayed the objectivity that one might expect from *960 press representatives, experienced in observing and reporting facts.
Their testimony was not characterized by any bitterness toward the marines, nor did it in any way reflect criticism of the official Government position in the Dominican intervention. In fact, following the tragedy and mindful of their opportunity to exploit it, they appeared unwilling to jeopardize the national interest in any way, and their published accounts of the shooting were restrained and objective, carefully avoiding any assessment of fault or blame.
86. The trial commissioner observed a continuation of this attitude throughout the trial. Their objectivity, and tendency toward understatement, was marred in only one instance toward the very end of the trial, and then only after alleged remarks by marine witnesses outside the hearing of the court (which were excluded from evidence), angered Mr. Burt. Mr. Burt had earlier testified that he was not one of those reporters critical of the U.S. intervention in the Dominican Republic, and thought there was some evidence of hard core communists among the so-called “rebels” which supported the position of the administration at that time. Finally, it was at the specific request of petitioners that this trial was held (both in Miami, Florida, and Washington, D.C.), without press coverage although it could well have been a trial deemed newsworthy by the press. As a result, the only persons present for the most part were those directly concerned with the trial of the issues.
EXPERIENCE OF PETITIONERS IN THE PERIOD IMMEDIATELY FOLLOWING THE COMMENCEMENT OF FIRING BY THE MARINES
87. As one would expect, the scene inside the blue Rambler after it received that volume of automatic and semiautomatic fire briefly described above, was one of horror. Petitioner Kennedy felt the car hitting something, never did see the driver leave the car, but was suddenly aware he was no longer there and that the car was stopped. He did not, in fact, ever see the driver again. The firing continued and he could hear bullets popping into the upholstery. He testified:
* * * I just couldn’t believe that it was happening. It just seemed unbelievable to me that this was happening.
*961 88. It will be recalled that Mr. Kennedy was sitting in the front seat next to the driver. His testimony at this point continues as follows:
I was suddenly hit in the leg and I remember being surprised that it didn’t hurt any more than it did. It just felt like something or somebody taking a stick and whacking me on the leg. The leg went numb and I yelled back at Al and I said, “I’ve been hit.”
He said, “I’ve been hit, too. ”
Then the firing continued. It just seemed to go on and on, and I have no idea how long it kept on, but it just seemed to be going on forever.
Then I was struck in the head, and it was like a severe blow to the top of the head. It didn’t knock me out, but I had no idea how badly I had been hit there.
I put my hand up and I came down covered with blood, and I thought the top of my head had been blown off. However, as it turned out, the wound was not as severe as I thought it was at the time. Apparently a bullet had creased along the top of my scalp.
So the door of the car was open on the driver’s side, and I remember — I was over that far that I could see the road beneath the car. There was blood dripping down from my head.
I told A1 that I felt that I was losing a tremendous amount of blood. I said, “I think I’m dying,” because I kept feeling weaker, and we both started shouting for help as loud as we could. Nothing happened.
Mr. Kennedy was of the opinion that their shouts for help could be heard, that they were yelling as loud as they could and at the top of their voices.
89. Petitioner Burt remembered that the first shots “blew out the windshield” and if they had not ducked, their heads would have been taken off. Petitioner Burt recalled that Mr. Kennedy was hit first, because he heard him scream. He, Mr. Burt, was lying flat on the floor in the back when bullets began to hit all around him inside the car. He said:
* * * I just felt them brush at me, along my right side. * * * I felt them hit my clothing up and down the right side and it was close to my leg. I felt a fragment hit into my chin, along my arm, along my leg, into my side, and then the major wound came when this sequence of bullets hit into the right hip or thigh, hip and thigh area, with the result that I bled quite a lot.
*962 I was bleeding all up and down the right side, chin, right arm, right leg and my entire lower portion of my body on the right side was numb.
90. Mr. Burt testified that when the shooting finally stopped, and it seemed like an awful long time that they continued shooting in the car, he tried to talk to Mr. Kennedy who said he was hit badly, was afraid he was bleeding to death. Mr. Burt also knew that he himself was hit quite badly, and was concerned because the lower portion of his body was numb. Pie thought there might be- broken bones or splinters that would impede his moving. He, too, was bleeding quite badly. Mr. Kennedy stated that he “felt he didn’t have very much time,” so Mr. Burt said he would try to get out of the car, “an extremely difficult thing to do because I was afraid that any movement from the car would start the Marines shooting again.”
91. Mr. Burt dragged himself out on the sidewalk side, and began shouting to the Marines: “We’re Americans, I’m the newspaperman who was with you yesterday afternoon. Don’t shoot. We’re Americans. We’re newsmen.” He recalls leaning against the car and holding his hands out to the side so that they could clearly see there was no threat of any kind. Pie shouted for help, and testified that he got no response. Corporal Gandia was still there but did not move, instead motioning him to come forward again. He recalls trying to move forward, blacking out, and when he came to, finding a Dominican soldier kneeling beside him pulling him. The marines still had not moved. There was a recollection that the Dominican soldier carried him down to the corner where the marine position was located, and behind a wall that bordered the sidewalk.
92. Mr. Kennedy meanwhile remained in the car and recalled seeing one of his cameras had dropped to the sidewalk or street, and blood was dripping on it. He also noticed that it had received a bullet, and been almost destroyed. His leg felt completely numb, and when he tested it with his hand it was completely covered with blood. He was feeling weaker and continued to shout for help for what seemd to him a long period of time. Meanwhile Mr. Burt was urging the marines to immediately get Mr. Kennedy because he knew he was in bad shape “and they wouldn’t go.” He finally con *963 vinced “some guy,” and under bis urgings a couple of marines went with tbat person to retrieve Mr. Kennedy from tbe car. Mr. Kennedy recalls a civilian appearing at tbe door of tbe car and asking, “Are you bit badly?” Wben Mr. Kennedy replied in tbe affirmative, tbe civilian shouted for a litter and be finally started to “swear at them to bring a litter.”
93. The civilian ripped his shirt off and used it to staunch tbe bleeding from Mr. Kennedy’s bead wound. Marines arrived with a litter and tried to remove him from the car but could not move him. He was asked to shove himself with bis own right leg “because you are jammed in her and we can’t get you out.” In this manner be was removed, placed on the litter, and taken away from the car. He was asked bis blood type, could not remember, and received plasma. He remembers a priest offering him prayers, which be gratefully accepted (although not of that faith), as the priest walked along beside them. He was put into a truck and driven to a helicopter site. The next time he saw Mr. Burt was when the latter was also being loaded into the helicopter. He had been given a shot for pain, and possibly a tourniquet at that time.
94. Mr. Burt recalls the following reaction while Mr. Kennedy was being removed from the car:
The first feeling was just an immense relief of gratitude or thankfulness that I hadn’t been killed, because I was convinced during the shooting that I would be killed. * * *
When I got out of it and was down where the Marines were, it was just a wonderful feeling of relief and thankfulness that we hadn’t been killed, and I hoped that Doug wouldn’t die yet.
The second feeling was a state of shock. It was as though I were two persons almost. I was lying on the sidewalk and bleeding from a great many wounds, but it was almost as though I were an observer of my own condition.
Doctors later told me this is a common symptom of shock.
The third feeling I had was that of no anger at the Marines, even though they committed this terrible mistake, plus which I was in their cai’e and there would be no time to voice any recriminations. I felt they were simply tense, scared young men who made a mistake.
*964 95. Mr. Burt recalls that they were then both taken to a field hospital where the seriousness of their wounds could be assessed. They were tagged, Mr. Burt was given intravenous fluids as a treatment for shock, and both were asked “a dozen times who the nest of kin was.” Both were taken to the aforementioned helicopter, and carried to the hospital ship, U.S.S. Raleigh, off Santo Domingo.
96. There is another partial conflict in testimony by the marines regarding the above described rescue efforts immediately following the shooting, and the comments by Petitioner Burt at that time. The aforementioned Captain Barba testified that once the car had come to a stop, nothing happened for 2 or 3 minutes. He testified:
* * * Then all of a sudden an individual got out of the car and started staggering down the wall toward our position. I guess he got down about 20 or 30 meters, to where we could hear him, and he said, I can’t remember his exact words, but he was saying “a U.S. reporter,” or something to that effect. And I sent, I believe, Sergeant Billingham and one other man — no, he came down a little further and we found out that he was speaking English, and we thought he was, could possibly be a U.S. reporter, and I sent Sergeant Billingham, I believe, and a corpsman to give him a hand. So we got him down 'to the corner. He was concerned about his friend who was still in the car. He said, “Don’t worry about me, I’ve got a buddy that’s bleeding to death in the car, he needs help.”
So I immediately rounded up — I believe it was a PC truck, and I put a machine gun in the back, and we backed the truck down to where the car was. I can’t remember how long it took to get the vehicle, but it was backed up down to where the other man was, and we put him in it, and went back up and called for an ambulance.
97. Corporal Gandia testified:
* * * Mr. Burt, he came out of the car, staggering down the side of the wall, shouting that he was an American, not to shoot him. So he came up where I was, and we went back, took him behind the wall where the Lieutenant was right there, and he lay down on the street there and said his buddy was dying in the car, for us to get him out, and I asked him what were they doing down there, and he said he didn’t bl'ame us for what we did, he was sorry he was down there, he didn’t blame *965 us for shooting at them because we didn’t — bow were we to know who they were in the car.
At that time he said he recognized Mr. Burt as the reporter with whom he had been speaking the prior afternoon. He further testified that he then went down to the car and:
*' * * We put a machine gun and squad of men on the truck, and we backed the truck all the way down, we parked right next to the car, we set up a defensive position arownd the ear, toward the monument, the George Washington Monument, I opened the door of the car, and I asked Mr. Kennedy how he was feeling, but he was passed out in the car. So we took him out of the car, put him on the back of the PC, and that’s the last I saw of him. [Emphasis supplied.]
Corporal Gandia said that at that time he observed the markings “PRENSA” on the front windshield of the car, and that was the first time he noticed them. He confirmed that there was white tape pasted across the right side of the windshield, not covering the driver’s view.
98. Captain Barba also recalled conversations with Mr. Burt while Mr. Kennedy was still back in the car. He recalled that Mr. Burt was not belligerent, was in pain, but relatively calm for the pain he was in. He testified that Mr. Burt said “if I had been in your position I would have done the same thing,” or something to that effect. He testified as to Mr. Burt’s statement:
Well, it was pretty close to just what I said, because that’s one thing that has stuck in my mind over the years, because it was a particular type situation, where the man was in pain, and I had a lot of respect for the man when he said it, because he had crawled down that fence, he had half of his rear end shot off, and the way he was sitting there when I was talking to him — I can’t remember whether he was standing up or laying down, but he made this statement, and I have often repeated it.
99. When describing the caution which he and his men exercised before moving out into the street and to the car, Captain Barba testified:
Well, we had a phase line, which we couldn’t — we couldn’t cross the phase line. It was the other side of the street, where the phase line was. We were not supposed ;to cross the phase line. The only person that ever crossed the phase line was the interpreter to stop the cars be *966 fore they got to the barricade and a few of the Dominican Nationals that went out with him..
When the incident happened, we didn’t realize at the time that they were U.S. reporters, they were just — in the first place, we wouldn’t have fired on the car.
100. With regard to the foregoing statements attributed to him by Captain Barba and Corporal Gandia, Mr. Burt testified on rebuttal, “I did not say that, and I regard it as a deliberate distortion.” He also denied any inference later while on the hospital ship, U.S.S. Raleigh, that the tragedy was the fault of the driver of the taxi. He testified that he attempted to exercise restraint in his expressions in the hours and days immediately after the shooting because:
A. Well, at first, I was in the Marines’ care. They had just finished shooting me, and now I was dependent upon them to continue to survive, so I didn’t feel that I was in the position to start accusing them of anything.
Secondly, I thought they had made a serious mistake, but ait that time at least I didn’t feel any personal hostility toward the Marines. And although I can’t remember my precise words, I do remember my impressions and feelings pretty, very clearly. And any statements that I made to the effect that I felt no personal hostility did not come out as they suggested.
Q. Did you have any feelings, sir, of restraint prompted also by your concern that the role of the United States in that hemisphere and how this incident might be interpreted by others ?
A. Yes, I did.
Q. And if so, describe that to the Court.
A. Yes, I did have very strong feelings about that, and they were refreshed quite a lot by hearing Colonel Creel [Director of the Joint Information Bureau], testify about newsmen swallowing whole communist propaganda, which is ridiculous.
At that time there was, as I have testified before, there was a major controversy, both in this country and in Santo Domingo, between the press and the civilian and military officials. I had been disturbed by this, I thought it was bad for everybody concerned. I did not want to say anything at the time of the shooting that would make this situation worse.
For example, if I may explain myself a little further, had I said at that time — accused the Marines and called them trigger happy at that time — the entire press force would have been inflamed into a much more severe *967 position than the one they took. I didn’t feel that was good for anybody.
Q. Now I ask you, sir, whether in these much more recent days your feelings or attitudes towards this matter have at all changed, and-
A. They have changed.
Q.-if so, why?
A. They have changed markedly, because I have sat here and listened to these Marine witnesses testify to what I consider deliberate distortions in trying to cover up a serious mistake that they have made.
101. It is not considered essential that this conflict in versions of conversations minutes after these events, be resolved. It is found that Mr. Burt’s explanation of his feelings and attitude at the time, is thoroughly understandable.
EXTENT AND PERMANENCY OE INJURIES SUEEEEED BY PETITIONERS AND EXTENT OE TREATMENT VOLUNTARILY PROVIDED
BY U.S. GOVERNMENT AGENCIES
102. Before discussing the testimony of petitioners as to their subjective pain and suffering and treatment, and prior to discussing the testimony of doctors at the trial on these points, there are certain documentary medical reports in the record which should be summarized.
In his statement before the Subcommittee of the Committee on the Judiciary preceding the reference of this matter for trial, the Honorable Dante B. Fascell stated that:
* * * Mr. Burt was shot twice in the buttocks and, after initial treatment aboard the S.S. Baleigh, was flown to Fort Bragg, North Carolina, where he spent six weeks in the base hospital.
Mr. Kennedy was much more severely wounded, his injuries consisting of a scalp wound which required 30 stitches to close, penetration of his body with hundreds of pieces of shrapnel, and multiple gunshot wounds of the left leg which were so severe that, at one point, a decision had been made to amputate the leg at the hip. He too was treated first aboard the Baleigh and later at Fort Bragg. After two weeks there, he was transferred to Walter Beed Hospital here in Washington where he remained until February of the following year.
*968 103. There were introduced before the Subcommittee by Congressmen Fascell and William H. Ayres, statements of the petitioners dated February 12, 1968, to this effect:
[Petitioner Burt]
I was unable to continue in my job, as Latin America Editor of The Herald, for which I had trained so long and upon which my future as a writer was geared. I tried my hand at a weekly newspaper venture in Georgia. It did not work out, and I returned here on general assignment.
The result of this was that I lost the lifetime job assurance which The Herald originally had given. It was forfeited when I left the paper because I no longer felt I could cover Latin revolutions. This sharply decreased my earning potential and forced me into a new direction, at which I had to build again. I faced this new assignment limited physically in my ability to gather the news, which of course determines the significance of what you write. At age 40, this disability makes me unemployable at most newspapers. Because it limits the material available to me, it also limits my free-lance earnings. This was a minimum of $1,000 a year and often considerably higher. I had expected it to continue rising. For example, a book on Haiti, for which I was under contract to Mc-Graw-Hill publishing company of New York, was due finished in 1965 and has not yet been fully completed. For this, I received a $2,000 advance and royalties to come later. The publication now is in doubt. Another publisher had asked me to accept a contract on a book on the Dominican Bepublic. I would have received $1,500 for signing and royalties depending upon sales. Both of these avenues of income have been denied me and I will not be able to do books of this nature in the future because the material will not be available to me. I also was preparing a book on Cuba for which I expected a contract.
As a result of gunshot wounds, I have been turned down for mortgage-life insurance on my house. I am having difficulty getting my hospitalization reinstated at The Herald.
Orthopedic surgeons based my 15 per cent disability primarily on loss of mobility in the right hip as measured in 1965. It is considerably less now, and the prognosis is that one day I will lose all mobility in that hip. This would mean I could walk only with a cane, and would hinder my movements additionally. One surgeon had told me the only alternative is an operation to give me a new hip socket, which is advised only in extreme cases.
*969 At present, I experience daily pain which doctors suggest must be borne, that I must learn to live with it. I may take two Bufferin four times a day, and a prescription painkiller (Darvon) if necessary. This dampens not only my outlook on life, but my ability to work and achieve pleasure from leisure recreation. It means that a thousand small things, like mowing the yard or doing work aromad the house, now are done either at great discomfort or someone must be hired.
[Petitioner Kennedy]
Prior to the wounding, I was able to do commercial photographic work for magazines, advertising agencies and public relations firms, on a freelance basis on my own time. I am now cut off from this source of income because of my disability. My work is now confined to a desk job at The Miami Herald. My left leg tires easily from walking. I cannot run and can walk only short distances at a time. Income from commercial work would mean a minimum of three thousand dollars a year, if I were able to do it.
My leg gives me constant pain. The pain is least intense first thing in the morning. As the day progresses, it becomes increasingly worse. This is a daily burden and now [sic] matter how I try to forget it, or ignore it, there is no real relief. The pain is caused by a combination of nerve damage and poor circulation because of muscle and arterial loss, according to Colonel Charles Metz, Chief of Orthopedics at Walter Peed Army Medical Center. This, I was told, is something I must learn to live with.
I am fortunate in that The Miami Herald has assured me continued employment. With my disability however, my potential earning power has been permantly [sic] reduced. Any chance of being offered a better position with another publisher is remote. To do a proper job in my field requires agility and stamina. The possibility of a higher paying position before the shooting, had been very much alive in discussions with representatives of Life magazine. My life has been completely altered. Things that used to be routine are now a struggle to do.
At age 42, when the shooting occurred, I had about 25 years of future earning power to look forward to.
Aside from the indescribable pain and suffering, past, present and future, I face a loss of earning power for the next 25 years. This is the result of the painful crippling executed by the Marines in Santo Domingo.
*970 104. A documentary exhibit from Marshall F. Hall, M.D., F.A.C.S. (practice limited to orthopaedic surgery) has this to say about Petitioner Burt as of January 31, 1970:
Alvin V. Burt, a 42 year old white male, was seen on January 30, 1970, for evaluation of his right hip. History: The patient gave a history of having been in the Dominican Republic in May 1965, covering the Dominican crisis, as the Latin-American Editor for the Miami Herald. He states he was the rear seat passenger in a Dominican taxicab, which was machinegunned by a U.S. Marine troop. The patient sustained gunshot wounds to the right side. Pie was taken to a First Aid Station, dressings were applied and he was transferred, via helicopter, to the hospital ship Raleigh. During his stay on the Raleigh, the patient underwent two operations ; a debridement and application of a full spica cast. The patient was subsequently transferred to Fort Bragg, North Carolina, where he remained for approximately six weeks. During this time, he had a second debridement, drainage and cast removal. The patient returned to Miami, Florida, in July or August 1965, and subsequently returned to part-time employment as the Latin-American Editor for the Miami Herald. The patient was under the care of Doctor C. A. Zarzecki, who removed some more of the metal fragments from his right side and placed the patient on therapy for his right hip. In 1969, the patient went under the care of Doctor Joseph Kalbac, and is presently under his care.
Present complaints: At this time, the patient complains of constant pain in his right hip and loss of motion.
Past History: History of previous arthritic condition, however, states this did not give him any major difficulty prior to hi's injury. No serious illnesses. Open reduction of his left upper arm in 1945. Cataract removed from his right eye in 1968. Tonsillectomy. Allergic to Penicillin.
Physical examination: Shows a well developed, well nourished, alert and cooperative male. He has an old deformity of his left arm, from a previous automobile accident.
The patient has some tendency toward kyphosis of the thoracic-lumbar spine, which is secondary to his Marie Strumpell’s arthritis.
As he stands before us, he has a large scar over the right buttock, which is adherent to the glutei muscles and when he tightens these muscles the scar indents. There Is some loss of gluteus function and weakness *971 to the' abductors to Ms right leg. He shows a 15-degree flexion contracture of the right leg and has exquisite pain and tenderness on attempts of internal external rotation. He has marked limitation of internal rotation and the leg is held external rotation of approximately 25- to 30-degrees. He has a good range of flexion and extension of his right knee, however, any type of motion to his hip gives him pain and tenderness. He has a scar above his right anterior-superior iliac spine and a scar anteriorly over the ilioinguinal area. The patient can go into a squatting position, however, with the stiffness to his back and neck, it is difficult for him to carry out this motion fully and maintain this position.
X-ray examination: X-rays of the thoracic and lumbar spine shows a Marie Strumpell’s arthritic changes with a bamboo spine. He has a bullet fragment to the right of the lumbar third vertebra and fairly well anterior into the abdominal cavity.
X-rays of the right hip shows a marked osteoarthritic change of the joint space with bullet fragments throughout the joint and the head of the femur. It appears he has had an old fracture, that has healed in a varus position. There is loss of joint space and loss of congruity of the hip. The metal fragments extend down at the junction of the proximal third and distal two-thirds of Ms right leg.
Impression: It is our impression this man has suffered a severe, disabling injury to his right hip, which, in the future will need an arthroplastic type of procedure. Because of his Marie Strumpell’s arthritis and immobility of the spine, any type of deformity of his hip is going to increase this man’s overall disability.
We feel, during the next two years, he will need an arthroplasty of his right hip, necessitating an expenditure of approximately $5,000.000 to $6,000.00, including hospital and doctor’s bills.
At this time, we feel he represents a 75% permanent disability of his right leg, as a result of his injury. Future surgery will decrease his temporary disability, however, will not alter his future permanent disability. This man will require a doctor’s evaluation at least three times a year, at a cost of approximately $150.0 per year. Diagnosis: Gunshot wounds, right iliac crest and Mp, into the abdomen, with severe degenerative osteoarthritic changes and permanent deformity of the right hip.
*972 The same exhibit has this to say about Petitioner Kennedy, as of January 30,1970:
Douglas E. Kennedy, a 47 year old white male, was seen on January 30, 1970, for evaluation of his left lower extremity.
History: The patient gave a history of having been in the Dominican Republic in May 1965, covering the Dominican crisis, as a news photographer. He states he was a right front seat passenger in a Dominican taxicab which was machine-gunned by a U.S. Marine troop. The patient sustained gunshot wounds of the left lower extremity. Pie was taken to a First Aid Station, dressings were applied and he was transferred, via helicopter, to the hospital ship Raleigh. During his approximate five day stay on the Raleigh, the patient underwent two operations on his left leg, a debridement and repair of the sciatic nerve and, because of a fractured femur, he was placed in a full spica cast. Approximately two days later, because of a spiking temperature, the cast was removed, the wound inspected and a second spica-cast applied. The patient was subsequently transferred to Fort Bragg, North Carolina, during which time the spica cast was removed, the wounds were re-debrided and a second repair of the sciatic nerve was performed. Approximately three weeks later, the patient was transferred to the Walter Reed Hospital, Washington, D.C. During his hospitalization two skin grafts were performed and several months later a sympathectomy was performed for relief of pain. The patient subsequently developed a bleeding stress ulcer, which was treated, and he was discharged from Walter Reed Hospital in December 1965, to return to Miami, Florida.
In January 1966, the patient had a recurrent attack of his bleeding ulcer and was hospitalized at Mercy Hospital under the care of Doctor Raymond Cohen. During the month of February 1966, the patient returned to the Walter Reed Hospital for out-patient physical therapy, consisting of strengthening and motion to the left lower extremity. The patient was in a full leg brace and went into a short leg brace, double upright with a Kleenzak pickup spring in approximately June 1966.
The patient was previously treated by Doctor C. A. Zarzecki for therapy of whirlpool and exercises, however, is no longer under his care.
The patient returned to work, as a news photographer, in the summer of 1966.
Present complaints: At this time, the patient complains of pain in his lower left leg and states this be *973 comes worse in the evening. He complains of numbness and hypersensitivity to his left leg.
Past history: No previous injury or difficulty with his left lower extremity. No serious illnesses. Tonsillectomy only previous surgery. No known drug allergies. The patient states he was in excellent health until the time of his injury in May 1965.
Physical examination: Shows a well developed, well nourished, alert male. Examination was limited to the left lower extremity. Examinations of the left foot shows weakness to the extensor hallucis longus and weakness to the dorsi flexor. He has fair strength to the gastroc group. Inversion and eversion is normal. Dor-salis pedis pulse could be felt. There is numbness over the medial aspect of his foot and some hypersensitivity over the lateral aspect of his foot.
Examination of the left calf shows extensive soft tissue loss with skin grafts over the lateral posterior aspect of his calf. He has continuity of the Achilles tendon, however, a large portion of this muscle mass and subcutaneous tissue has been lost. There is some adherence to the tibia on the lateral aspect. He has an area of numbness over the medial aspect of his left leg. He has a full range of extension and 50-degrees of flexion to his left knee. He has a large area of grafting over the pop-liteal space with scar formation and loss of a portion of the medial belly of the gastroc muscle as it attaches to the femoral condyle. There is no protective tissue in and about the popliteal artery. He has some loss of the semi-tendinosus and semimembranosus muscle, of the hamstring group. There is weakness to this hamstring group on attempted full extension. He has a mid-line scar on the posterior aspect. His glutei group is good.
The patient, at this time, is wearing a short leg, double upright with a Kleenzak pick up spring.
On muscle examination, there is function to the pero-neal brevis, however, very limited. On dorsi flexion, he does have the anterior tibialis, the extensor hallucis longus and the common extensors, however, they are all weak. He has some function to the posterior tibialis. X-ray examination: AP of the pelvis shows some clips in the paravertebral area. Pie shows an old, healed fracture, with metal fragments at the junction of the proximal one-third and distal two-thirds of the femur. The hip joints are well maintained.
X-rays of the left knee shows some tendency toward genurecurvatum. There are a lot of metal fragmentations *974 at the junction of the proximal third and distal two-thirds of the tibia. The patella rides very high.
X-rays, AP and lateral, of the left anide shows some metal fragmentation distal to the fibula.
Impression: It is our impression this man has reached maximum medical benefits and no further active surgery is indicated. It is miraculous that he has a leg that is still serviceable. He does have approximately i/2-inch shortening to his leg. He has sensation oyer the plantar surface of his foot and, with this sensation, he should not, in the future, form ulcerations.
We feel he represents a 70% permanent disability of his left leg, as a result of his injury. He will need medical evaluation approximately twice a year at an annual cost of approximately. $125.00. He will need a new brace every year and a half at a cost of approximately $70.00. Recurring infection, in and about the metal fragments is a probability, requiring at least two future hospitalizations at approximately $500.00 to $600.00 per hospitalization.
Diagnoses: 1) Gunshot wounds, left leg. 2) Fractured left femur. 3) Soft tissue injury, left popliteal space and lower gastroc group. 4) Injury to the sciatic nerve, left.
105. There is a documentary exhibit in the record consisting of a letter to Hon. Dante B. Fascell from Lee Hills, Executive Editor of the Knight Newspapers, which bears on the extent of medical care furnished by the military following the shooting and circumstances under which that care was discontinued. Excerpts from it are as follows:
Of more direct concern to me is the abrupt reversal in the posture taken by the Department of Defense. More than two years have elapsed since the incident occurred and I think it important that the committee recall the situation of that time and be apprised of the conduct and positions of both Burt and Kennedy and of the Department of Defense, which seem to me significant.
* * * * *
The Department of Defense, meantime, accepted full responsibility for the care and medical treatment that Burt and Kennedy required. Normal procedure would call for any accidentally injured newsman to he treated od a military facility onl/y if that facility was the most immediately available and then to he transported to the United States for private care in primate medical facilities. [Emphasis supplied.]
*975 Instead, Burt and Kennedy were evacuated to the TJSS Raleigh for treatment, then flown to Fort Bragg, North Carolina, for further treatment. Burt was discharged at Fort Bragg while Kennedy was transferred to Walter Reed Hospital for additional surgery and treatment.
The Department of Defense was clearly aware of the precedent involved and gave every indication that it was accepting this unique responsibility because it was well aware of the unfortunate role of the U.S. military in their wounding.
Numerous conversations occurred between the Department of Defense and representatives of Knight Newspapers in the weeks that followed the shooting and, at my direction, a record of those conversations has been kept. Without reviewing them all, let me call your attention to the following:
1. In response to my request for clarification on the Department’s position, I received on M'ay 12, 1965, a telegram from Assistant Secretary of Defense Arthur Sylvester. It read in part: “I assure you that both men are receiving best possible care. Full investigation of circumstances surrounding incident is being made. I will, of course, keep you advised. Meanwhile, the complete medical capabilities of the Defense Department and its components will be at their disposal as long as they desire.”
2. Later that same day, I conferred with Deputy Assistant Secretary of Defense Phil Goulding. I reviewed Mr. Sylvester’s telegram with him and asked if that telegram meant exactly what it said. My personal notes show that Mr. Goulding reaffirmed the commitment made by Mr. Sylvester. Mr. Goulding said that the Department’s assumption of care was “practically unique” and pointed out that it was in any case a sharp departure from established procedure. He said that the Department “apparently” had no legal liability but said the Department had decided to accept the responsibility for medical care anyway.
3. We had numerous reaffirmations of the Department’s intention to provide whatever care necessary in the months that followed. As late as December 4,1965, when it was obvious that Kennedy was so disabled that long-term care was a distinct possibility, I raised the question again with Mr. Goulding.
My notes show that Mr. Goulding indicated that the Department would continue to offer and supply whatever medical care Mr. Kennedy required. He again referred to the earlier departmental decision to accept *976 responsibility and said be expected no problem with, for instance, ont-patient care.
It is worth noting that the Department’s own investigation of the incident had been completed months before, on June 7, 1965 to be exact. Indeed, the Department’s position had been made so clear that President Johnson had been moved to write Mr. Kennedy that “It gives me heart that the Army is able to offer you medical assistance and care as it would any other combat veteran.” That letter was dated May 29,1965.
Regrettably, all this was to change. Despite the fact that the Department had done everything possible to acknowledge its responsibility by assuming the burden of care for these men, it was unwilling to carry through that responsibility.
On February 24, 1966, I talked with Mr. Goulding again, trying to determine what Kennedy should do when he required future medical attention.
Mr. Goulding told me then that Mr. Kennedy should get in touch with the Army if he required further care, whereupon arrangements would be made for him to be treated either at a military hospital or by military doctors. He said that he could think of no reason why anyone in the Department would decide otherwise in view of the then well-established commitment to Mr. Kennedy. Mr. Goulding pointed out that he himself did not have the authority to commit the government to lifetime care but said he would explore the question and notify me of its resolution.
The response to that conversation is found in a final letter to me from Mr. Goulding dated March 14,1966, a copy of Which is attached to this letter.
106. The reply of March 14,1966, by Mr. Goulding, Deputy Assistant Secretary of Defense, reads in pertinent part as follows:
I am advised that the United States is not legally liable for the shooting, and that medical care to date has been given the men as a matter of grace, not right. This has been done under the Department of Defense Appropriations Act and medical care regulations which authorize Department of Defense officials to extend care on an ad hoc basis to persons who would not otherwise be eligible.
It is not possible to know whether the Appropriations Act or the governing regulations will be modified. I am advised that neither the Secretary of the Army nor, indeed, the Secretary of Defense, could bind future officials in this matter.
*977 107. Mr. Burt’s subjective recollection of Ms suffering and experience following the shooting, is that he was kept on the hospital ship, U.S.S. Baleigh, from May 6 until May 9. He underwent two operations aboard the ship, one to remove metal consisting of both bullets and automobile fragments and a second operation to remove contaminated flesh. The wound in the high-thigh area was described by the doctor as one that might have been made by a grenade, requiring trimming away of jagged and ripped flesh. Following the second operation he was placed in a cast from chest to knees and he described this as “perhaps the most difficult time of all. They put the cast on me while I was asleep, and when I awoke the cast had wrenched particularly the right hip so that it felt as though it was almost out of socket. It caused a great deal of pain. As a matter of fact, it was the most severe pain I ever felt, a great deal more than the gunshot wound in comparison.” The cast had been put on to protect him during transportation to the hospital at Fort Bragg on the supposition that bone chips and possibly a hairline fracture had been detected. Incidentally, while aboard the U.S.S. Baleigh, Mr. Burt recalls a visit from Gen. John Griswald Bouker, U.S. Marine Corps, who told him the shooting never should have happened. He quotes General Bouker as saying, “I thought we had those guys under better fire control than that.”
108. Petitioners Burt and Kennedy were airlifted from the hospital ship to Womack Hospital at Fort Bragg, North Carolina. Mr. Burt was kept there for about 6 weeks. At Womack the cast was removed about 10 days after arrival. There was another operation to cut away flesh and prevent infection, and a drain placed in the wound for some time. Finally, the wound was closed. After release from Womack in mid-June of 1965, Mr. Burt took a couple of weeks off since he was anxious to return to Miami and begin working for the Herald once again. He returned to work in August 1965 on a part-time basis and worked half-time for the next year or so, returning to his home when he began to feel badly. He tried a few trips on Latin-American affairs wMch he knew so well, but found that he could not endure them. He was obliged to turn down an offer arranged through the *978 U.S. Information Agency late in the fall of 1966 to write a book about the Dominican Republic covering the period following the aforementioned civil strife. After contracts had been arranged, he found that he could not do the book, and could not stay in Santo Domingo.
109. Upon his return to Miami, Mr. Burt saw a Dr. Zarzecki, an orthopaedic surgeon designated by his employer’s insurance carrier, and the doctor removed a bullet from the right appendix area that had been causing a great deal of difficulty. In addition to his physical discomfort, Mr. Burt found that he no longer had mobility and had lost his zest and desire to cover “crisis” situations. As a result, he arranged to buy part interest in a small weekly newspaper in northeast Georgia and tried running that for about 10 •months, but the venture was only moderately successful and he rejoined the Herald in another capacity as an editorial writer, a job requiring no great mobility or obligation to go out and gather facts. Mr. Burt still has a great many fragments up and down his arm and leg and side, some of which lie fairly close to the surface. On occasions they have had to be removed, in some cases by a Dr. Kalbac who succeeded Dr. Zarzecki for the insurance company. He is informed there is one fragment about three-quarters of an inch long and half an inch or so wide in the hip which he is advised to leave there, because it cannot be removed without muscle damage.
110. Mr. Burt is aware that the shooting aggravated a preexisting arthritic condition which had produced a spine of limited mobility. He states the prior arthritic condition made him perhaps a little awkward, but it had been quiescent and had produced no pain. Since the shooting, the mobility of h'is right hip has been limited, the condition seems to be worsening, and the extent to which he can straighten his leg has sharply decreased. If he stands for an hour he suffers severe pain, and must get off his leg or suffer several days of severe pain. Mr. Burt at the time of the trial noticed deterioration in his ability to stand and to straighten his leg. He experiences pain on a day-to-day basis, taking an average of six to eight Bufferin a day or a stronger drug (Indocin, with some undesirable side effects) if the Bufferin fails. If the Indocin also fails, he is required to go to bed. He can no *979 longer walk more than sis or eight blocks at the most, mow his lawn, play golf, or fish.
111. Mr. Kennedy’s subjective recollection of his suffering and experience is that he also spent several days aboard the hospital ship, U.'S.S. Raleigh, where he was 'taken immediately to the operating room and X-rayed for a skull fracture. Upon awakening from anesthesia he found himself in a full cast from the armpits to his feet. A navy surgeon said to him, “You had a pretty rough time. We thought we were going to lose you a couple of times because you were losing blood faster than we could put it in.” The doctor said, “I think you are going to be all right now.” He was then sedated and slept. Mr. Kennedy recalls suffering from a continuously elevated temperature, and the decision was made to operate because of infection. He was returned to the operating room aboard the U.S.'S. Raleigh, the cast was removed, he was packed in ice, given an anesthesia, and the wound again cleansed. He next remembers awakening, back in the cast. The same navy surgeon advised him that he had spent 8 hours operating on the leg and in conference with other surgeons on the ship they had considered amputation, but felt there was a chance of saving it and decided to give it a chance. The surgeon stated he did not know how successful they might have been because the damage was extensive. One of the two branches of the main artery into the leg had been shot away, and the other one damaged. The main nerve had been all but severed and was hanging by a thread. A great deal of metal had been removed. He displayed to Mr. Kennedy a handful of small pieces but explained that he could not get nearly all of it out. Mr. Kennedy recalls a conversation with Admiral McCain, Commander of the American naval forces during the Dominican civil strife, and that the admiral stated his sorrow, that he could see no reason why it had happened, that he wanted to apologize on behalf of the United States.
112. Mr. Kennedy was kept at Fort Bragg for 2 or 3 weeks, during which time one operation was performed to clean out the wound and remove more fragments. Where the nerve had been sewn together on the hospital ship, it was now wired together at Fort Bragg for a more permanent fastening. The body cast was removed and a full spica cast substituted from the armpits to and through the foot. His right foot was *980 left free, but there was a bar connecting the left leg to the right leg and he was put in a Forster frame so that he could be turned. The cast described makes it impossible to sit up, and the frame provides, in effect, a rotating bed which can be turned to permit the patient to eat.
113. Mr. Kennedy describes pain “so bad that it was impossible to sleep. I have never had so much pain as that. It was a constant pain and a terrifying pain. They kept giving me medication, but the medication even didn’t put a dent in it.” He continued as follows:
The only relief I would get at all would be when I would fall asleep for brief periods. When I would wake up, I would hate to wake up because I knew I was in for it all over again. It was a terrible pain.
114. Mr. Kennedy was then flown to Walter Heed Hospital from Fort Bragg in a military plane for further treatment and skin grafts, because the wounds were still open. He was a patient at Walter Keed from about the middle of June 1965 until Christmas. He had a total of three operations at Walter Reed and a skin graft which was only partially successful, followed by a skin graft which was successful. Difficulties arose because an area of the bone became infected with osteo-myelitis which has since cleared up. Mr. Kennedy was removed from the aforementioned Forster frame, and put in a regular bed about September 1965.
115. While at Walter Reed, Mr. Kennedy woke one morning and vomited a tremendous amount of blood which was later attributed to a “stress” ulcer resulting from his injuries. This required extensive treatment. He underwent another operation in an effort to relieve pain in the leg which was “continuing” and “terrible.” When a spinal needle failed to deaden the nerve, he underwent a sympathectomy oper-ration which involves cutting a nerve into his leg at a point in the abdomen. He was advised that following such an operation, his leg would probably always be dry and would not perspire normally. This operation provided temporary relief. A few days later the pain returned resulting in mental dejection. He has had constant pain since.
116. At Walter Reed he was fitted with a full leg brace that came up to and around the groin, and with the aid of crutches he was permitted to go home for Christmas. While home, *981 the stress ulcer erupted again and he was taken to Mercy Hospital in Miami where, after 10 days, he was returned to Walter Need as an out-patient for about a month. Since that time he has been under the care of the aforementioned insurance company doctors, Zarzecki and Kalbac.
117. Since leaving Walter Keed in January of 1966, Mr. Kennedy has experienced a continuous “gnawing, agonizing type pain,” which increases progressively during the day. He is determined not to get “hooked” on drugs, and therefore takes aspirin constantly, and Dar von occasionally. He sometimes has to leave work early, remove the brace, and elevate the foot to obtain some relief. He has been advised that it is a pain he will have to learn to live with the rest of his life, morning and night. He has been able to play golf, which was an important part of his life, by using an electric cart. He can no longer hike or camp, and can go fishing only if no walking is involved.
118. Mr. Kennedy has been retained as chief photographer at the Herald where he returned in the early summer of 1966, more than a year after the shooting, first on a part-time basis and, after several months, on a full-time basis. He no longer travels at all, and spends 99 percent of his time in the office.
119. While hospitalized at Walter Keed in an out-patient status, Mr. Kennedy was married. He had planned to be married in June of 1965 and there was an emotional wrench and mental anguish involved with regard to whether he should suggest relieving his fiance of their prior commitment to one another. They were, however, married at a time when Mr. Kennedy was still on the aforementioned Forster frame, and when it was not clear whether he would ever walk again.
120. Medical testimony produced by petitioners at the trial in supplementation of the aforementioned documentary reports and their own testimony is hereinafter summarized:
A well-qualified and distinguished orthopaedic surgeon, Dr. Joseph Kalbac (also qualified as an expert in service-connected disabilities since he had served on the air force medical boards rating disabilities and was currently an orthopaedic examiner for the military and civil examiner in Dade County, Florida), is the insurance company doctor who took over from Dr. Zarzecki when *982 the latter incurred a coronary and could no longer treat Messrs. Kennedy and Burt. He first saw Mr. Burt on October 18, 1969, when petitioner was complaining of a piece of shrapnel in the subcutaneous right groin area. After taking a history, he removed the shrapnel with local anesthesia. He examined Mr. Burt and reported 50 percent range of motion, observed the scars and the absence of the gluteus maximus muscle. In subsequent visits, he determined that there were shrapnel wounds predominantly over the right hip, right side of the abdomen and right chin. He studied all of the prior military medical records, and was aware of the gunshot wound in the right buttocks with a slug overlying the iliac crest, which had been later removed by the aforementioned Dr. Zarzecki. The doctor was informed, and made a report, of the continuous pain suffered by Mr. Burt, as above described, and the drugs he Was required to take to relieve it. The doctor was informed by Mr. Burt that “ [h]e felt that since his accident the curvature in his spine was much worse, along with worse posture, which would be expected with contracture. The right Hip seemed to be bothering him more. He felt that his condition in the right hip had deteriorated within the last two years.” The doctor testified at length on the limitation of motion to which Mr. Burt was then subjected, and the fact that X-rays revealed a lot of metallic foreign bodies. He concluded that Mr. Burt had, as a result of the gunshot wounds, sustained 30 percent disability of the body as a whole, and that the disability was permanent. He expressed the opinion that he could conceivably be 100 percent impaired from doing the job that he performed prior to the gunshot wounds, and that he may require further surgery on his right hip in the future. It was his opinion, at the time of the trial, that Mr. Burt had recovered as much as he was going to and; furthermore, that he had “a good chance of requiring something to be done in his right hip, should it degenerate with wear and tear.”
121. Dr. Kalbac expressed the opinion that there is a 50 percent chance that in the future Mr. Burt will require an arthroplasty, and testified as follows on this point:
In a situation like his, probably the commonest procedure that I employ is a cup arthroplasty in which through an incision around the hip, an extensive incision, we actually go in and remove all the inflamed scar tissue around the hip joint to increase the motion and then we smooth off the head of the bone, the round *983 femural bead, shave it down, and then wo put a metallic cup, which acts basically like a bushing and allows more motion in there.
The other procedure would be again if this had to be done 20 years from now, rather than in the nest five years, a person might just amputate that head of the bone and put in a prosthesis instead of just a cup to cover it. If he was 20 years older, we just might take this out, put in the prosthesis and thereby he could bear weight sooner than he would with a cup and get along easier.
122. Dr. Kalbac also felt that there was a good chance of fragments of shrapnel in Mr. Burt’s body causing trouble in the future, including possible bone infection. He thought the pain suffered by Mr. Burt, rather than going away, would probably increase over the years.
123. Dr. Kalbac’s testimony with respect to Mr. Kennedy was that he had sustained three gunshot wounds in the left lower extremity, one in the femur (in the distal area of the leg), one at the calf (part of which was shot away), and one behind his knee. There was a fracture of the left femur (thigh) in the proximal third of the bone just below the hip, with muscle loss to the thigh, to the popliteal area which is behind the knee, and the cap of his leg. The posterior tibial nerve was injured and the posterior tibial artery was severed. Dr. Kalbac described the severance of the artery as a serious injury, because it results in very little circulation going to the leg except for small vessels going to the knee. The severance of the nerve causes tibial nerve palsy, because this nerve supplies the muscles that permit the foot to be pushed down. Without it a person cannot control his foot, and has a drop-type foot.
124. After describing the history of the military treatment received by Mr. Kennedy, including the aforementioned scalp wound, and the various operations he had undergone as earlier mentioned, Dr. Kalbac stated that the main trouble currently suffered by Mr. Kennedy was the continuous pain in the left lower extremity for which he took the drugs earlier described. He described the patient’s complaints of alternate numbness and ultrasensitivity in the leg, and the patient’s inability to distinguish between heat and cold. Dr. Kalbac described the limited use of the leg available to Mr. Kennedy, *984 and tlie brace be was required to wear. His testimony described massive scarring, and also N-rays revealing numerous pieces of foreign metal throughout the injured area.
125. On the basis of his total testimony, Dr. Kalbac concluded that Mr. Kennedy had sustained disability to the body as a whole of 35-40 percent, based on the same established tables which he had used to rate Mr. Burt’s permanent disability earlier. He testified that he would give the same disability ratings to both men had they been sent to him by the Veterans’ Administration, for example. Dr. Kal-bac concluded that the aforementioned sympathectomy had not fully relieved Mr. Kennedy’s pain, and that medication was the only alternative in his case. He had concluded that the nerve severance above described was a permanent injury which will not regenerate, based on an electromy-ography which he had performed the previous week. All muscle supplied by the damaged nerves will not function, any sensation derived from these nerves will be absent, and he will have to wear a short leg brace for the rest of his life unless he elects to have an operation to make the joint stiff and eliminate the brace. In Mr. Kennedy’s case, Dr. Kalbac felt the foreign metallic substances within his body had a good chance of causing difficulties in the future, and that Mr. Kennedy had gotten as well as he was ever going to get. He felt that Mr. Kennedy had an excellent chance of developing arthritis in the knee, and might require an operation to fuse the knee if pain persists.
126. Dr. Kalbac observed that foreign metallic bodies are irritants which set up inflammation, and Mr. Kennedy may have osteomyelitis or bone inflammation in the future. The doctor concluded that Mr. Kennedy’s prior activities as a sportsman are going to be “markedly limited” in the future.
127. The other medical witness presented by petitioners was Dr. Marshall Hall, whose written report appears earlier in these findings. At the trial he also was qualified as a distinguished physician, with specialty in orthopaedics. In addition to private practice, he has spent a year in the Air Force as an orthopaedic surgeon, and has been consultant to the Air Force at Olmstead Air Force Base. He teaches ortho-paedic surgery at the University of Miami School of Medicine *985 and bas received many honors for his work. As indicated in the written reports herein mentioned, Dr. Hall had occasion to examine petitioners in January of 1910, just prior to the trial, without being aware of whether he was examining them on behalf of plaintiffs or defendant.
128. With respect to Mr. Burt, after taking a medical history, he observed generally the same conditions described by Dr. Kalbac, and stated as a conclusion that “the wounds to the pelvis and to the hip, with the metal fragments therein, are causally related to this gunshot injury that occurred back in May of 1965.” He felt the patient’s disability was permanent and that he is suffering a 75 percent disability of his right leg. He would translate this to a permanent disability to the body as a whole of 35-40 percent. He based his conclusion on the fact that the hip is completely destroyed at this time. It has some function. However, there is no question, according to Dr. Hall, that he will need further operative procedure, and he believes it is in the not too distant future. The operative procedure the doctor contemplated was a total hip replacement, both the pelvic portion and the femur portion, using an acrylic type of plastic material. He felt that this operation would involve an expenditure of between five and six thousand dollars in medical costs. Dr. Hall felt that the “exquisite” pain currently suffered by Mr. Burt would diminish after such surgery, but that he would always have pain. With respect to the preexistent arthritic condition, Dr. Hall felt that the arthritis had made greater demands on Mr. Burt’s right hip which the hip could not meet because of the injuries which it had sustained from the gunshot wounds. He was of the opinion that Mr. Burt “will never be able to resume any type of activity in which ambulating is a part of it — competitive type of work.” Dr. Hall explained that the percentage of permanent disability to the body as a whole “35-40%” that he attributed to Mr. Burt did not include the preexistent arthritic condition; but that he would not have rated the disability to the hip caused by the gunshot wounds that high, had the hip condition not been aggravated by the arthritis.
129. Dr. Hall’s examination of Mr. Kennedy and his medical history produced generally the same findings earlier de *986 scribed by Dr. Kalbac. Following extensive testimony, he concluded that Mr. Kennedy was suffering 70 percent permanent disability of the left leg, arrived at from the history and findings concerning the injury to muscle, tendon, bone and loss of nerve function. Translated into permanent disability of the body as a whole, he felt that this was equivalent of 28-30 percent. He was of the opinion that there were no further surgical procedures that would be beneficial to Mr. Kennedy at this time, and that there was nothing that he could be given at this time that will in any way cure his pain. He was of the opinion that Mr. Kennedy’s healing process was at a standstill, and that he would show no further improvement. He felt that the metal fragments would occasionally give problems in the future, and that Mr. Kennedy’s preaccident sports activities, as earlier described, would be grossly curtailed.
130. Petitioners were concerned about their future employment with the Miami Herald and they have been assured by the present management of the Miami Herald that their continuing employment would be guaranteed, provided they did their jobs to the best of their ability. The newspaper kept both petitioners on its payroll while they were recuperating and both received relatively minor workmen’s compensation benefits during their hospitalization, including lump sum benefits ($2,200 for Mr. Burt and $6,700 for Mr. Kennedy), as well as payment for medical care obtained from sources other than facilities of the U.S. Government.
131. It is apparent from all the foregoing subjective and medical evidence, that petitioners have not yet been compensated for their pain and suffering, past, present and future; nor for their permanent disability; nor for the loss of the “upward mobility” in their respective professions which each appeared to be enjoying at the time of the shooting above described.
CONCLUSIONS
It is concluded on the basis of all of the foregong facts that petitioners Kennedy and Burt are not chargeable with contributory negligence in the tragic shooting described above. Nor could they reasonably be charged with “assumption of risk,” particularly from “our” side, given the en- *987 outraging climate for newsmen existing at the time; their own prior experience; the experience of other distinguished newsmen; and their behavior immediately preceding the incident. For the same reason, it is concluded that their driver acted reasonably under the circumstances. Even if it could be otherwise concluded (and it cannot), his actions cannot be imputed to petitioners any more than the carelessness of any taxi driver would be imputable to passengers in his taxi.
Moreover, the troops at checkpoint “Alpha” 'affirmatively demonstrated inexperience, lack of professional poise, carelessness, poor fire control, a failure to comply with the general orders in effect, and a failure to comply with the specific orders of the young officer controlling them at the checkpoint. (Findings 84,85 and 86). These factors were the proximate cause of this tragedy.
If one were to conjecture how a series of events such as this could occur, it appears likely from an exhaustive examination of the record that the corporal manning the machine-gun on the tank might have confused the first shots fired by Corporal Gundia and his companions when the driver of the car (recognized as a Dominican) opened his door, with what he thought was “Incoming” sniper fire. Certainly that explanation is as plausible as the internally inconsistent explanation of the marine witnesses that they directed overwhelming automatic fire at the car because of a few rounds of “incoming” fire, which petitioners did not hear. In any event, the hand gestures described by Corporal Gandia, over a period of 5 minutes by his own estimate, were demonstrably ambiguous, contradictory and confusing to any persons of average intelligence and experience.
Above all, however, is the fact that this is a case in which Congress has asked that the facilities of this Court be utilized to examine whether “in equity and good conscience” petitioners are entitled to recompense. By that test, writers[1] analyzing instances wherein Congress prior to 1855 engaged in *988 its own nonjudicial evaluation of equitable claims, observed back then that:
A claimant’s freedom from fault must be established. But if 'he has been shown not to be blameworthy, he has virtually made out a prima facie case for relief.
We have here a typical case calling for equitable relief, for the very reason that the Federal Tort Claims Act[2] fails to provide a remedy because of one of the exceptions therein contained. A leading Congressional Reference case in this court[3] involving inter alia, this same exception to the Federal Tort Claims Act, had this to say:
Since this is a Congressional reference, however, we are to examine the broader “equitable” facets of plaintiffs’ claim. We determine, in that connection, whether the nation owes a “debt” based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law” (United States v. Realty Company, 163 U.S. 427, 440 (1896)). In making that evaluation it is proper to consider, among other things, whether the claim is of a type recoverable against a private individual (Burkhardt v. United States, 113 Ct. Cl. 658, 667-68 (1949)). It is also relevant to take account of the general principles governing the particular area of the law bearing on the claim (Estate of Fairbank v. United States, 164 Ct. Cl. 1, 8, 10, 11 (1964)).[4]
Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949), cited in the foregoing quotation, is often mentioned as a landmark case in this field. The Court stated at 666-67, 84 F. Supp. at 558-59:
The Government contends that Congress used the term “legal or equitable claim” in Section 2509 of the Judicial Code, supra, in its strict legal sense and not in *989 a broad general sense meaning “moral claim,” and submits that the claim of the plaintiffs is not an “equitable claim” as that term is used.
í[í ífc $ 'I*
This court has previously had occasion to consider a special jurisdictional act of Congress which conferred jurisdiction upon the court “to enter such decree or judgment against the United States for such loss and damage as equity and justice shall require (Lamborn and Company v. United States, 106 C. Cls. 703), and especially the Government’s contention that the court was limited by that act to the determination of whether plaintiff had a legal or equitable claim in the strict sense of that term as usually applied in a court of law and equity. We interpreted the special act of Congress to mean “equity and justice” in its broad meaning rather than in the strict sense in which such term is understood and applied in equity jurisprudence (p. 723).
We are therefore of the opinion that the term “equitable claim” as used in 28 U.S.C., Sec. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable consideration. * * * [5]
There is evidence in this record (not previously discussed) that at the time of the shooting, top Government officials characterized the wounding of these petitioners as “tragic and unjustified.” An Associated Press account datelined Washington, May 8, 1965, and introduced at the trial, quotes Hon. Arthur Sylvester, Assistant Secretary of Defense for Public Affairs, as endorsing that characterization with these introductory words:
I can do not better than repeat the words of Col. George Creel, senior U.S. information officer in Santo Domingo * * *.
At the trial Colonel Creel (Ret.) testified that he had been misquoted; that he had used the word “unfortunate,” not “unjustified.” However, the distinction is not important in *990 the context of this case. On an examination of the whole record, this tragedy could be characterized as “unjustified” or “unfortunate,” or both, so as to support a recommendation for relief on equitable grounds, in the nonjuridical sense of that term.
It is not insignificant that in the transcribed proceedings before the Blouse subcommittee prior to the reference of this case, the Navy’s witness testified with respect to this relief bill:
No, we said we couldn’t support it under any law we administer, but I don’t think you will find that the Department opposed the bill * * *. We can not sponsor the bill.
The extensive and generous medical care afforded petitioners by the military following the shooting confirms this official reaction.
In its amended answer (filed almost a year after the original answer to the petition), defendant raises a new defense to the effect that the shooting was caused by agents of the Organization of American States (OAS), and not of the United States, and therefore the latter is not equitably liable. There is no support whatever in the record for this contention.
Defendant’s own witness, the aforementioned General Palmer, testified that it was not until May 29,1965, long after this incident, that “General Alvim of the Brazilian Army * * * took over as the Commander of what was at that time called the Interamerican Force, later changed to the Inter-American Peace Force, and I became his Deputy Commander of the Interamerican Force and retained my U.S. Command.” (Emphasis supplied.)
On May 6th, when this shooting occurred, the OAS empowered a five-man commission (on Which the United States was not represented), which provided certain diplomatic guidance (not well-defined in the record). But on that date, the marines at checkpoint “Alpha” reported exclusively to the U.S. Commander, General Palmer, entirely through a U.S. Marine chain of command. General Palmer’s testimony on this point was clear, and it was confirmed by that of Ambassador Bennett. The marines involved in this incident were clearly agents of the United States, under U.S. command, and acting in accordance with U.S. orders.
*991 DAMAGES
The issue of the amount of damages remains for disposition. In a case such as this, the award to the claimants sufficient to compensate them for pain and suffering (past, present and future); the effects of permanent disability; and for the fact that their careers, which were clearly in the ascendancy, have been permanently interrupted, would normally be within the province of a jury, and not subject to precise and mathematical determination. This case is further complicated by the fact that extensive early medical care was afforded petitioners by defendant, by workmen’s compensation, and the fact that certain monetary losses were mitigated by the enlightened attitude of their employer. The fact remains, however, that the uncompensated damages to petitioners (as appears from their testimony, the medical testimony, and the prognoses), remain grave and formidable.
The bill referred by the Congress (finding No. 2), speaks specifically of the sum of $75,000 for Petitioner Kennedy, and the sum of $50,000 to Petitioner Burt. However, the referral in H.R. 1110 is plenary in its direction of consideration of “negligence or other fault of the U.S. and/or equity and good conscience and any other matters within the court’s jurisdiction” under the enabling statute. The petition (finding No. 4) “prays for an award of not less than Seventy-five Thousand Dollars” for Mr. Kennedy, and “not less than Fifty Thousand Dollars” for Mr. Burt. Following the trial and introduction of all the proof, petitioners’ prayers for relief were in effect amended to conform to the proof; and they have asked for $125,000 for Mr. Kennedy and $85,000 for Mr. Burt. A letter from petitioners’ counsel dated July 31, 1969, following informal pretrial conferences with defendant’s original counsel of record, reads in pertinent part as follows:
Amenities aside, Mr. Smith and I have agreed along the following lines, although I reserve to him the right to re-phrase its substance or form:
1. The Government does not argue that claimants are necessarily limited to the amounts stated in the reference bill, simply because those amounts were so stated; the Government does, however, expect to argue that claimants are not entitled to any recovery, because they *992 assumed the risk of injury by entering the Dominican Eepublic under the circumstances then existing.
2. The Government reserves the. right to dispute evidence of claimants’ medical damages, because “permanency and pain and suffering” are intangible and indeterminate; the Government does not, however, expect to dispute the facts of claimants’ injuries, hospitalization, and the courses and histories of their treatments:
This letter has been read to Mr. Smith before its delivery to you, and I understand him to be in general agreement with it.
The enabling act under which this case was heard (finding No. 1), directs the trial commissioner to determine, among other things “ * * * the amount, if any, legally or equitably due from the United States to the claimant [s].”
All of the foregoing considered, and considering the damages as would a jury, this trial commissioner has determined that petitioners are entitled to at least the sums recited in the aforementioned bill. Since introduction of the bill, their condition has worsened, and there has intervened the further ravages of inflation. It is believed, incidentally, that petitioners heard medical testimony regarding their condition during the trial, as to which they were not previously fully informed. They exhibited considerable distress, and Mr. Burt was on one occasion obliged to leave the courtroom.
In light of all of the foregoing, it is therefore further concluded that the amounts set forth in the bill should be exceeded, if that is not precluded by the wording of the bill, and if authorized by the other considerations summarized above. The amounts set forth in the post trial brief might not be deemed excessive in the light of present-day jury verdicts, but this is not a controversial tort action. Based on all the proofs on damages (findings Nos. 87 through 131), it is further concluded that, if permissible, Petitioner Kennedy should be awarded $100,000; and Petitioner Burt should be awarded $75,000.

 Brown v. United States, 256 U.S. 335, 343 (1921).

 Findings Nos. 61, 72, and 79.

 Pub. L. 89-681 (Oct. 16, 1966), 80 Stat. 958, 28 U.S.C. §§ 1492, 2509 (1970).

 E.g., Alleman v. United States, 43 Ct. Cl. 144, 151 (1908). In that case the court, -with respect to congressional reference cases, stated:
<■* * * They ore a separate class of cases designed to supply Information so full and exact as to leave to the legislative body nothing to do but determine the justice of the complaint (usually transmitted in papers accompanying the bills) as a legal or equitable demand against the United States; or, as one resting upon no law but depending upon moral considerations of such character as may or may not fairly appeal to the bounty of the Government. The endeavor of the court Is to frame the findings with accuracy such as to enable Congress to discriminate between a meritorious claim and an application for a gift as a mere matter of favor. In the class of actual ‘claims’ so reported with an amount stated, it will generally be found that our findings rest upon an actual benefit either received by the Government or a liability assumed by the United States and where no equity exists there Is generally something to show a want of merit.”
See also Elmers v. United States, 172 Ct. Cl. 226 (1965) ; Georgia Kaolin Co. v. United States, 145 Ct. Cl. 39 (1959) ; Electric Ferries, Inc. v. United States, 137 Ct. Cl. 400 (1957) ; Torti v. United States, 135 Ct. Cl. 214 (1956) ; Gay Street Corp. v. United States, 130 Ct. Cl. 341, 127 F. Supp. 585 (1955) ; Cusimano v. United States, 125 Ct. Cl. 351 (1953) ; and Fidelity Trust Co. v. United States, 101 Ct. Cl. 831 (1944).

 Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553 (1949). As the review panel opinion points out, the facts of the Burhhardt case did not require disposition on the basis that the claim was a non-juridlcai equitable claim based upon broad moral principles. See also Rumley v. United States, 169 Ct. Cl. 100, 105 (1965), and Town of Kure Beach, North Carolina v. United States, 168 Ct. Cl. 597 (1964).

 United States v. Realty Co., 163 U.S. 427, 440 (1896).

The opinion, findings of fact, and conclusions are submitted under the order of reference and the Rules of the Chief Commissioner.

 Gellhorn & Lauer, Congressional Settlement of Tort Claims Against the United States, 55 COLUM. L. REV. 1, 13 (1955).

 28 U.S.C. 2680(k). 10 U.S.C. 2733 also fails to provide a remedy at law.

 Estates of E. L. Armiger v. United States, 168 Ct. Cl. 379, 384, 339 F. 2d 620, 628 (1964).

 See also note 1 supra at 13 wherein the writers observe:
“A claim will be recognized if it is thought to be within the ‘general policy’ of a statute that provides for federal accountability, even though the claim may not be embraced by the precise statutory language. Conversely, the claim will be denied if Congress discerns an exclusionary policy in a statute, even if it does not explicitly lit the present case. In short, federal statutes are used not merely as direct precedents, but as guides and analogies to aid in deciding a case not yet dealt with by an applicable general law * *

 See also Town of Kure Beach v. Unites States, 168 Ct. Cl. 597 (1964), for a scholarly discussion of equitable claims and their evaluation in “the broader moral sense based upon general equitable considerations”; North Counties Hydro-Electric Co. v. United States, 170 Ct. Cl. 241 (1965) ; and Rumley v. United States, 169 Ct. Cl. 100 (1965).